## ALLIS-CHALMERS CORP. *v.* LUECK

No. 83–1748.   Argued January 16, 1985—Decided April 16, 1985

BLACKMUN, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the consideration or decision of the case.

*Theophil C. Kammholz* argued the cause for petitioner. With him on the briefs were *Richard H. Schnadig* and *Stanley R. Strauss.*

*Gerald S. Boisits,* by appointment of the Court, 469 U. S. 978, argued the cause for respondent. With him on the brief were *Kurt A. Frank* and *James E. Kenny.**

JUSTICE BLACKMUN delivered the opinion of the Court.

The Wisconsin courts have made the bad-faith handling of an insurance claim a tort under state law. Those courts have gone further and have applied this tort to the handling of a claim under a disability plan included in a collective-bargaining agreement. The question before us is whether, in the latter case, the state tort claim is pre-empted by the national labor laws.

## I

## A

Respondent Roderick S. Lueck began working for petitioner Allis-Chalmers Corporation in February 1975. He is a member of Local 248 of the United Automobile, Aero-

---

*Briefs as *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Andrew M. Kramer, Willis J. Goldsmith,* and *Stephen A. Bokat;* and for the American Federation of Labor and Congress of Industrial Organizations by *Laurence Gold.*

*Bronson C. La Follette,* Attorney General of Wisconsin, *Charles D. Hoornstra,* Assistant Attorney General, and *Michael A. Lilly,* Attorney General of Hawaii, filed a brief for the State of Wisconsin et al. as *amici curiae* urging affirmance.

space and Agricultural Implement Workers of America. Allis-Chalmers and Local 248 are parties to a collective-bargaining agreement. The agreement incorporates by reference a separately negotiated group health and disability plan fully funded by Allis-Chalmers but administered by Aetna Life & Casualty Company. The plan provides that disability benefits are available for nonoccupational illness and injury to all employees, such as petitioner, who are represented by the union.

The collective-bargaining agreement also establishes a four-step grievance procedure for an employee's contract grievance. This procedure culminates in final and binding arbitration if the union chooses to pursue the grievance that far. App. 18–29. A separate letter of understanding that binds the parties creates a special three-part grievance procedure for disability grievances. *Id.*, at 43–44. The letter establishes a Joint Plant Insurance Committee composed of two representatives designated by the union and two designated by the employer. *Id.*, at 43. The Committee has the authority to resolve all disputes involving "any insurance-related issues that may arise from provisions of the [Collective-Bargaining] Agreement." *Ibid.* An employee having an insurance-related complaint is to address it first to the Supervisor of Employee Relations. If the complaint is rejected or otherwise remains unresolved, the employee then may bring the dispute before the Insurance Committee. If the Committee does not resolve the matter, the employee may bring it to arbitration in the manner established under the collective-bargaining agreement. As indicated, that agreement permits the union or the employer to request that a grievance be submitted to final and binding arbitration before a neutral arbitrator agreed upon by the parties.[1]

---

[1] The letter of understanding states:

"Questions within the [Joint Plant Insurance] Committee's scope shall be referred to it, and shall not be processed in the first three steps of

In July 1981, respondent Lueck suffered a nonoccupational back injury while carrying a pig to a friend's house for a pig roast. He notified Allis-Chalmers of his injury, as required by the claims-processing procedure, and subsequently filed a disability claim with Aetna, also in accordance with the established procedure. After evaluating physicians' reports submitted by Lueck, Aetna approved the claim. Lueck began to receive disability benefits effective from July 20, 1981, the day he filed his claim with Aetna.

According to Lueck, however, Allis-Chalmers periodically would order Aetna to cut off his payments, either without reason, or because he failed to appear for a doctor's appointment, or because he required hospitalization for unrelated reasons. After each termination, Lueck would question the action or supply additional information, and the benefits would be restored. In addition, according to Lueck, Allis-Chalmers repeatedly requested that he be reexamined by different doctors, so that Lueck believed that he was being harassed. All of Lueck's claims were eventually paid, although, allegedly, not until he began this litigation.[2]

---

the grievance procedure . . . , but may be presented for arbitration in the established manner once they have been discussed and have not been resolved." App. 43.

The Supreme Court of Wisconsin, *Lueck* v. *Aetna Life Ins. Co.*, 116 Wis. 2d 559, 564, 342 N. W. 2d 699, 701–702 (1984), correctly assumed that this provision required that disputes within the Committee's scope be resolved exclusively through arbitration. See *Vaca* v. *Sipes*, 386 U. S. 171, 184 (1967); *Republic Steel Corp.* v. *Maddox*, 379 U. S. 650, 652–653 (1965). The use of the permissive "may" is not sufficient to overcome the presumption that parties are not free to avoid the contract's arbitration procedures. *Id.*, at 658–659.

[2] Lueck asserts that ultimately he was given disability payments for a period up to March 12, 1982. We find no specific record evidence of this fact. An affidavit dated February 22, 1982, submitted by Allis-Chalmers, states that Lueck received payments from July 20, 1981, to January 15, 1982. App. to Pet. for Cert. 33. The complaint was filed on January 18.

## B

Lueck never attempted to grieve his dispute concerning the manner in which his disability claim was handled by Allis-Chalmers and Aetna. Instead, on January 18, 1982, he filed suit against both of them in the Circuit Court of Milwaukee County, Wis., alleging that they "intentionally, contemptuously, and repeatedly failed" to make disability payments under the negotiated disability plan, without a reasonable basis for withholding the payments. App. 4. This breached their duty "to act in good faith and deal fairly with [Lueck's] disability claims." *Id.*, at 3. Lueck alleged that as a result of these bad-faith actions he incurred debts, emotional distress, physical impairment, and pain and suffering. He sought both compensatory and punitive damages. *Id.*, at 4.

Ruling on cross-motions for summary judgment, the trial court ruled in favor of Allis-Chalmers and Aetna. The court held that Lueck stated a claim under § 301 of the Labor Management Relations Act of 1947 (LMRA), 61 Stat. 156, 29 U. S. C. § 185(a), and that, in the alternative, if his claim "were deemed to arise under state law instead of Section 301," it was "preempted by federal labor law." App. to Pet. for Cert. 26–27. The Wisconsin Court of Appeals, in a decision "[n]ot recommended for publication in the official reports," *id.*, at 25, affirmed the judgment in favor of Aetna on the ground that it owed no fiduciary duty to deal in good faith with Lueck's claim. The court agreed with the Circuit Court that federal law pre-empted the claim against Allis-Chalmers.[3]

---

[3] In particular, the Court of Appeals found that since Allis-Chalmers' conduct arguably constituted an unfair labor practice under § 8(a)(5) of the National Labor Relations Act (NLRA), 49 Stat. 452, as amended, 29 U. S. C. § 158(a)(5), that section pre-empted the bad-faith claim under the reasoning of *Farmer* v. *Carpenters*, 430 U. S. 290 (1977). The court did not reach the question whether § 301 of the LMRA also pre-empted the claim.

The Supreme Court of Wisconsin, with one justice dissenting, reversed. *Lueck* v. *Aetna Life Ins. Co.*, 116 Wis. 2d 559, 342 N. W. 2d 699 (1984). The court held, first, that the suit did not arise under § 301 of the LMRA, and therefore was not subject to dismissal for failure to exhaust the arbitration procedures established in the collective-bargaining agreement. The court reasoned that a § 301 suit arose out of a violation of a labor contract, and that the claim here was a tort claim of bad faith. Under Wisconsin law, the tort of bad faith is distinguishable from a bad-faith breach-of-contract claim: though a breach of duty exists as a consequence of the relationship established by contract, it is independent of that contract. Therefore, it said, the violation of the labor contract was "irrelevant to the issue of whether the defendants exercised bad faith in the manner in which they handled Lueck's claim." *Id.*, at 566, 342 N. W. 2d, at 703. The action, thus, was not a § 301 suit.

The court went on to address the question whether the state-law claims nevertheless were pre-empted by §§ 8(a)(5) and (d) of the National Labor Relations Act (NLRA), 49 Stat. 452, as amended, 29 U. S. C. §§ 158(a)(5) and (d). Applying the standard for determining NLRA pre-emption as enunciated in *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 244–245 (1959), and *Farmer* v. *Carpenters*, 430 U. S. 290, 296–297 (1977), the court determined that the claims were not pre-empted. It found that the administration of disability-claim procedures under a collective-bargaining agreement is a matter only of peripheral concern to federal labor law, since payment of a disability claim is not a central aspect of labor relations. On the other hand, the court observed, the bad-faith insurance tort is of substantial significance to the State of Wisconsin, which has assumed a longstanding responsibility for assuring the prompt payment of disability claims. Permitting the state action to proceed would not have an adverse impact on the effective adminis-

tration of national labor policy, since the courts will make no determination as to whether the labor agreement has been breached.

Finally, the court found that Aetna could be liable to Lueck for bad-faith administration of his disability claim since it was an agent of Allis-Chalmers for the purpose of administering claims. It thus reversed the appellate court's judgment and remanded the case for a determination whether Aetna played any role in the processing of Lueck's disability claim. Aetna has not sought review of that part of the judgment. We granted certiorari, 469 U. S. 815 (1984), to determine whether § 301 of the Labor Management Relations Act pre-empts a state-law tort action for bad-faith delay in making disability-benefit payments due under a collective-bargaining agreement.

## II

Congress' power to pre-empt state law is derived from the Supremacy Clause of Art. VI of the Federal Constitution. *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824). Congressional power to legislate in the area of labor relations, of course, is long established. See *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937). Congress, however, has never exercised authority to occupy the entire field in the area of labor legislation.[4] Thus the question whether a certain state action is pre-empted by federal law is one of congressional intent. "'The purpose of Congress is the ultimate touchstone.'" *Malone* v. *White Motor Corp.*, 435 U. S. 497, 504 (1978), quoting *Retail Clerks* v. *Schermerhorn*, 375 U. S. 96, 103 (1963).

Congress did not state explicitly whether and to what extent it intended § 301 of the LMRA to pre-empt state law.

---

[4] "We cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States." *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 289 (1971). See also *Brown* v. *Hotel and Restaurant Employees*, 468 U. S. 491 (1984); *Garner* v. *Teamsters*, 346 U. S. 485, 488 (1953).

In such instances courts sustain a local regulation "unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Malone* v. *White Motor Corp.*, 435 U. S., at 504. The question posed here is whether this particular Wisconsin tort, as applied, would frustrate the federal labor-contract scheme established in § 301.

## III

### A

Section 301 of the LMRA states:

> "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties. . . ." 29 U. S. C. § 185(a).

In *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448 (1957), the Court ruled that § 301 expresses a federal policy that the substantive law to apply in § 301 cases "is federal law, which the courts must fashion from the policy of our national labor laws." *Id.*, at 456. That seminal case understood § 301 as a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts.[5]

The pre-emptive effect of § 301 was first analyzed in *Teamsters* v. *Lucas Flour Co.*, 369 U. S. 95, 103 (1962), where the Court stated that the "dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute [so that] issues raised in suits of a kind covered by § 301 [are] to be decided according to the precepts of federal labor policy." The Court concluded that "in enacting § 301 Congress intended doc-

---

[5] In *Charles Dowd Box Co.* v. *Courtney*, 368 U. S. 502 (1962), the Court held that state courts had concurrent jurisdiction over § 301 claims.

trines of federal labor law uniformly to prevail over inconsistent local rules." *Id.*, at 104.

The *Lucas Flour* Court specified why the meaning given to terms in collective-bargaining agreements must be determined by federal law:

> "[T]he subject matter of § 301(a) 'is peculiarly one that calls for uniform law.' . . . The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation . . . [and] might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes." *Id.*, at 103–104 (footnote omitted).

For those reasons the Court in *Lucas Flour* held that a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law. A state rule that purports to define the meaning or scope of a term in a contract suit therefore is pre-empted by federal labor law.

## B

If the policies that animate § 301 are to be given their proper range, however, the pre-emptive effect of § 301 must extend beyond suits alleging contract violations. These poli-

cies require that "the relationships created by [a collective-bargaining] agreement" be defined by application of "an evolving federal common law grounded in national labor policy." *Bowen* v. *United States Postal Service*, 459 U. S. 212, 224–225 (1983). The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract.

Were state law allowed to determine the meaning intended by the parties in adopting a particular contract phrase or term, all the evils addressed in *Lucas Flour* would recur. The parties would be uncertain as to what they were binding themselves to when they agreed to create a right to collect benefits under certain circumstances. As a result, it would be more difficult to reach agreement, and disputes as to the nature of the agreement would proliferate. Exclusion of such claims "from the ambit of § 301 would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law." *Smith* v. *Evening News Assn.*, 371 U. S. 195, 200 (1962).

Of course, not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law. Section 301 on its face says nothing about the substance of what private parties may agree to in a labor contract. Nor is there any suggestion that Congress,

in adopting § 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation.[6] Such a rule of law would delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored. Clearly, § 301 does. not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. In extending the preemptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.[7]

---

[6] This is not to suggest that courts may not need to consider other factors in determining whether a state rule is pre-empted by § 7 or § 8 of the NLRA. See Cox, Recent Developments in Federal Labor Law Preemption, 41 Ohio St. L. J. 277, 294–300 (1980). The NLRA pre-empts state laws that " 'upset the balance of power between labor and management expressed in our national labor policy.' " *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 146 (1976), quoting *Teamsters* v. *Morton*, 377 U. S. 252, 260 (1964). See *New York Telephone Co.* v. *New York Labor Dept.*, 440 U. S. 519 (1979). Thus pre-emption under § 7 or § 8 involves considerations related to but distinct from those at issue here. Nor do we need to discuss the different kinds of questions posed by pre-emption necessary to protect the jurisdiction of the National Labor Relations Board. See *Teamsters* v. *Lucas Flour Co.*, 369 U. S. 95, 101, n. 9 (1962).

The parties have not briefed the question whether this tort suit would be pre-empted by the Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U. S. C. § 1001 *et seq.* Because we hold that this claim is pre-empted under § 301, there is no occasion to address the separate question of pre-emption by ERISA. See 29 U. S. C. § 1144(b)(2)(B).

[7] Analogously, in *Malone* v. *White Motor Corp.*, 435 U. S. 497 (1978), the Court rejected the view that a right established in a state pension statute was pre-empted by the NLRA simply because the NLRA empowered the parties to a collective-bargaining agreement to come to a private agreement about the subject of the state law:

"There is little doubt that under the federal statutes governing labor-management relations, an employer must bargain about wages, hours, and

Therefore, state-law rights and obligations that do not exist independently of private agreements, and that as a result can be waived or altered by agreement of private parties, are pre-empted by those agreements. Cf. *Malone* v. *White Motor Corp.*, 435 U. S., at 504–505 (NLRA pre-emption).[8] Our analysis must focus, then, on whether the Wisconsin tort action for breach of the duty of good faith as applied here confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract. If the state tort law purports to define the meaning of the contract relationship, that law is pre-empted.

## IV

### A

The Wisconsin Supreme Court asserted that the tort claim is independent of any contract claim.[9] While the nature of

---

working conditions and that pension benefits are proper subjects of compulsory bargaining. But there is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues, such as pension plans, that may be the subject of collective bargaining." *Id.*, at 504–505.

[8] In *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974), the Court found that the NLRA conferred rights "on employees collectively to foster the processes of bargaining," *id.*, at 51, and distinguished such rights which could be waived by contract between the parties, on the one hand, from an individual's substantive right derived from an independent body of law that could not be avoided by a contractual agreement, on the other.

[9] 116 Wis. 2d, at 565, 342 N. W. 2d, at 702. The Wisconsin court alternatively suggested that the tort claim was not pre-empted because the existence of a breach of contract, if relevant, "would constitute only a minor aspect of the controversy." *Id.*, at 570, 342 N. W. 2d, at 705. The court then applied the labor law pre-emption doctrine established in *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236 (1959), and concluded that since only minor aspects of the controversy were within the jurisdiction of the NLRB, *Garmon* pre-emption did not apply. 116 Wis. 2d, at 570–571, 342 N. W. 2d, at 705. The court's pre-emption discussion thus concerned whether the tort claim should be pre-empted in order to protect

the state tort is a matter of state law, the question whether the Wisconsin tort is sufficiently independent of federal contract interpretation to avoid pre-emption is, of course, a question of federal law. Though the Wisconsin court held that the "specific violation of the labor contract, if there was one, is irrelevant to the issue of whether the defendants exercised bad faith in the manner in which they handled Lueck's claim," 116 Wis. 2d, at 566, 342 N. W. 2d, at 703, upon analysis it appears that the court based this statement not solely on its unassailable understanding of the state tort, but also on assumptions about the scope of the contract provision which it had no authority to make under state law.

The Wisconsin court attempted to demonstrate, by a proffered example, the way in which a bad-faith tort claim could be unrelated to any contract claim. It noted that an insurer ultimately could pay a claim as required under a contract, but still cause injury through "unreasonably delaying payment" of the claim. *Id.*, at 574, 342 N. W. 2d, at 707. In such a situation, the court reasoned, the state tort claim would be adjudicated without reaching questions of contract interpretation. *Ibid.* The court evidently assumed that the only obligations the parties assumed by contract are those expressly recited in the agreement, in this case the right to receive benefit payments for nonoccupational injuries.

---

the NLRB's primary jurisdiction over unfair labor practice charges.

In addressing only the question of the necessity of protecting the Board's jurisdiction, the court "confuse[d] pre-emption which is based on actual federal protection of the conduct at issue from that which is based on the primary jurisdiction of the National Labor Relations Board." *Brown* v. *Hotel and Restaurant Employees*, 468 U. S., at 502. So-called *Garmon* pre-emption involves protecting the primary jurisdiction of the NLRB, and requires a balancing of state and federal interests. The present tort suit would allow the State to provide a rule of decision where Congress has mandated that federal law should govern. In this situation the balancing of state and federal interests required by *Garmon* pre-emption is irrelevant, since Congress, acting within its power under the Commerce Clause, has provided that federal law must prevail. 468 U. S., at 502–503.

Thus, the court reasoned, the good-faith behavior mandated in the labor agreement was independent of the good-faith behavior required by state insurance law because "[g]ood faith in the labor agreement context means [only] that parties must abide by the specific terms of the labor agreement." *Id.*, at 569, 342 N. W. 2d, at 704.

If this is all there is to the independence of the state tort action, that independence does not suffice to avoid the preemptive effect of § 301. The assumption that the labor contract creates no implied rights is not one that state law may make. Rather, it is a question of federal contract interpretation whether there was an obligation under this labor contract to provide the payments in a timely manner, and, if so, whether Allis-Chalmers' conduct breached that implied contract provision.

The Wisconsin court's assumption that the parties contracted only for the payment of insurance benefits, and that questions about the manner in which the payments were made are outside the contract is, moreover, highly suspect.[10] There is no reason to assume that the labor contract as interpreted by the arbitrator would not provide such relief. On its face, the agreement allows the Joint Plant Insurance Committee to resolve disputes involving "*any* insurance-related issues that may arise" (emphasis added), App. 43, and hardly suggests that only disputes involving the right to receive benefits were addressed in the contract. And if the arbitrator ruled that the labor agreement did *not* provide

---

[10] This assumption also was relied on by respondent's counsel during oral argument. Thus, counsel acknowledged that if the contract allowed the arbitrator to provide relief for bad-faith payment of benefits, respondent would have been required to make use of the arbitration procedure and the federal law of contracts to obtain relief. Tr. of Oral Arg. 25. Counsel argued that, under state law, respondent was entitled to recover in tort only because "I'm going for something that . . . the contract does not provide for. The contract provides for payment of disability benefits. That's it. . . . [I]f the insurance company continued to sporadically make payments, Mr. Lueck wouldn't be able to do anything under the contract because he wouldn't have a grievance." *Id.*, at 35.

such relief expressly or by implication, that too should end the dispute, for under Wisconsin law there is nothing that suggests that it is not within the power of the parties to determine what would constitute "reasonable" performance of their obligations under an insurance contract. In sum, the Wisconsin court's statement that the tort was independent from a contract claim apparently was intended to mean no more than that the implied duty to act in good faith is different from the explicit contractual duty to pay. Since the extent of either duty ultimately depends upon the terms of the agreement between the parties, both are tightly bound with questions of contract interpretation that must be left to federal law.

## B

The conclusion that the Wisconsin court meant by "independent" that the tort is unrelated to an explicit provision of the contract is buttressed by analysis of the genesis and operation of the state tort. Under Wisconsin law, the tort intrinsically relates to the nature and existence of the contract. *Hilker* v. *Western Automobile Ins. Co.*, 204 Wis. 1, 13–16, 235 N. W. 413, 414–415 (1931). Thus the tort exists for breach of a "duty devolv[ed] upon the insurer by reasonable implication from the express terms of the contract," the scope of which, crucially, is "ascertained from a consideration of the contract itself." *Id.*, at 16, 235 N. W., at 415. In *Hilker*, the court specifically noted:

> "Generally speaking, good faith means being faithful to one's duty or obligation; bad faith means being recreant thereto. In order to understand what is meant by bad faith a comprehension of one's duty is generally necessary, and we have concluded that we can best indicate the circumstances under which the insurer may become liable to the insured . . . by giving with some particularity our conception of the duty which the written contract of insurance imposes upon the carrier." *Id.*, at 13, 235 N. W., at 414.

The duties imposed and rights established through the state tort thus derive from the rights and obligations established by the contract. In *Anderson* v. *Continental Ins. Co.*, 85 Wis. 2d 675, 689, 271 N. W. 2d 368, 375–376 (1978), which established that in Wisconsin an insured may assert a cause of action in tort against an insurer for the bad-faith refusal to honor the insured's claim, the court stated that the tort duty was derived from the implied covenant of good faith and fair dealing found in every contract. It relied for that proposition on the Restatement (Second) of Contracts § 205 (1981), as well as on the adoption of the Restatement's position in *Gruenberg* v. *Aetna Ins. Co.*, 9 Cal. 3d 566, 575, 510 P. 2d 1032, 1038 (1973). The *Gruenberg* court explicitly stated that the breach sounded in both tort and contract, and there is no indication in Wisconsin law that the tort is anything more than a way to plead a certain kind of contract violation in tort in order to recover exemplary damages not otherwise available under Wisconsin law. *Anderson* v. *Continental Ins. Co.*, 85 Wis. 2d, at 686–687, 271 N. W. 2d, at 374.[11] Therefore, under Wisconsin law it appears that the parties to an insurance contract are free to bargain about what "reasonable" performance of their contract obligation entails. That being so, this tort claim is firmly rooted in the expectations of the parties that must be evaluated by federal contract law.

---

[11] See also *Kranzush* v. *Badger State Mutual Casualty Co.*, 103 Wis. 2d 56, 64, 307 N. W. 2d 256, 261 (1981) ("The insured's right to be treated fairly . . . is rooted in the contract of insurance to which he and the insurer are parties"). Given the tort's genesis in contract law, this result is not surprising. "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205, Comment *a*, p. 100 (1981). Questions of good-faith performance thus necessarily are related to the application of terms of the contractual agreement.

We pass no judgment on whether an independent, nonnegotiable, state-imposed duty which does not create similar problems of contract interpretation would be pre-empted under similar circumstances.

Because the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, any attempt to assess liability here inevitably will involve contract interpretation. The parties' agreement as to the manner in which a benefit claim would be handled will necessarily be relevant to any allegation that the claim was handled in a dilatory manner. Similarly, the question whether Allis-Chalmers required Lueck to be examined by an inordinate number of physicians evidently depends in part upon the parties' understanding concerning the medical evidence required to support a benefit claim.[12] These questions of contract interpretation, therefore, underlie any finding of tort liability, regardless of the fact that the state court may choose to define the tort as "independent" of any contract question.[13] Congress has mandated that federal law govern

---

[12] Here, for example, record evidence suggests that Allis-Chalmers, which ultimately was responsible for the benefit payments, and Aetna, which made the payments to claimants, had developed a complex system of overlapping procedures to determine continuing eligibility to receive benefits. The manner in which claims were verified by physicians, and the procedures for canceling benefits, were also apparently established through the practice of the parties. See Deposition of Karen Smaglik 17–23, 28–30; Deposition of A. J. Abplanalp 5–15. Had this case gone to trial, a central factual question would have been whether the manner in which Lueck's claim was processed and verified had departed substantially from the standard manner of processing such claims under the contract. That question, of course, necessarily involves contract interpretation.

[13] Prior Wisconsin cases had stated that the existence of a breach of contract cannot be irrelevant to the existence of a tortious breach of duty created by the contract. In the principal Wisconsin case, the court determined that there must be a breach of contract which is not even "fairly debatable" before a tort claim could be made. *Anderson* v. *Continental Ins. Co.*, 85 Wis. 2d 675, 691, 271 N. W. 2d 368, 376 (1978). If a claim is denied in the "absence of a reasonable basis" and with "knowledge or reckless disregard of a reasonable basis," the denial is actionable in tort. *Id.*, at 693, 271 N. W. 2d, at 377.

Even if the Wisconsin Supreme Court in *Lueck* announced a change in the nature of the tort, the derivation of the tort in contract law would still

the meaning given contract terms.   Since the state tort pur-
ports to give life to these terms in a different environment, it
is pre-empted.

## C

A final reason for holding that Congress intended § 301 to
pre-empt this kind of derivative tort claim is that only that
result preserves the central role of arbitration in our "system
of industrial self-government." *Steelworkers* v. *Warrior &
Gulf Navigation Co.,* 363 U. S. 574, 581 (1960).   If respond-
ent had brought a contract claim under § 301, he would have
had to attempt to take the claim through the arbitration pro-
cedure established in the collective-bargaining agreement be-
fore bringing suit in court.   Perhaps the most harmful aspect
of the Wisconsin decision is that it would allow essentially the
same suit to be brought directly in state court without first
exhausting the grievance procedures established in the bar-
gaining agreement.   The need to preserve the effectiveness
of arbitration was one of the central reasons that underlay
the Court's holding in *Lucas Flour.*   See 369 U. S., at 105.
The parties here have agreed that a neutral arbitrator will be
responsible, in the first instance, for interpreting the mean-
ing of their contract.   Unless this suit is pre-empted, their
federal right to decide who is to resolve contract disputes will
be lost.

Since nearly any alleged willful breach of contract can be
restated as a tort claim for breach of a good-faith obligation
under a contract, the arbitrator's role in every case could be
bypassed easily if § 301 is not understood to pre-empt such
claims.   Claims involving vacation or overtime pay, work
assignment, unfair discharge—in short, the whole range of
disputes traditionally resolved through arbitration—could be

require a court to evaluate the nature of the contractual relationship in
order to assess liability.   For purposes of federal labor law, the tort is not
sufficiently independent of questions of contract interpretation to avoid the
pre-emptive effect of § 301.

brought in the first instance in state court by a complaint in tort rather than in contract. A rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness, *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650, 653 (1965), as well as eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance.

V

The right that Lueck asserts is rooted in contract, and the bad-faith claim he brings could have been pleaded as a contract claim under § 301. Unless federal law governs that claim, the meaning of the health and disability-benefit provisions of the labor agreement would be subject to varying interpretations, and the congressional goal of a unified federal body of labor-contract law would be subverted. The requirements of § 301 as understood in *Lucas Flour* cannot vary with the name appended to a particular cause of action.

It is perhaps worth emphasizing the narrow focus of the conclusion we reach today. We pass no judgment on whether this suit also would have been pre-empted by other federal laws governing employment or benefit plans. Nor do we hold that every state-law suit asserting a right that relates in some way to a provision in a collective-bargaining agreement, or more generally to the parties to such an agreement, necessarily is pre-empted by § 301. The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis. We do hold that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, see *Avco Corp.* v. *Aero Lodge 735,* 390 U. S. 557 (1968), or dismissed as pre-empted by federal labor-contract law. This complaint should have been dis-

missed for failure to make use of the grievance procedure established in the collective-bargaining agreement, *Republic Steel Corp.* v. *Maddox*, 379 U. S., at 652, or dismissed as pre-empted by § 301. The judgment of the Wisconsin Supreme Court therefore is reversed.

*It is so ordered.*

JUSTICE POWELL took no part in the consideration or decision of this case.