ADKERSON v MK-FERGUSON COMPANY

Docket No. 120434. Submitted December 4, 1990, at Grand Rapids. Decided September 3, 1991, at 9:15 A.M. Leave to appeal sought.

Billy J. T. Adkerson brought an action in the Berrien Circuit Court against MK-Ferguson Company, alleging handicap discrimination in connection with the termination of his employment. Adkerson was discharged on the basis of a psychological evaluation and because of a perceived handicap, his alleged alcoholic tendencies. The defendant, a subcontractor that hired Adkerson to perform carpentry at a nuclear power plant, moved for summary disposition, and the court, Zoe S. Burkholz, J., granted the motion, finding Adkerson's claim preempted by the Atomic Energy Act, 42 USC 2011 et seq., and § 301 of the Labor Management Relations Act, 29 USC 185. Norma J. Adkerson, as personal representative of the estate of Billy J. T. Adkerson, deceased, appealed.

The Court of Appeals held:

Summary disposition was improperly granted. The decedent's state law claim is not preempted by the Atomic Energy Act, the Energy Reorganization Act, 42 USC 5801 et seq., or § 301 of the Labor Management Relations Act. On remand, the trial court must determine whether alcoholism is a "handicap" as defined by the Handicappers' Civil Rights Act at the time of the decedent's dismissal and whether one who has alcoholic tendencies, but does not work under the influence of alcohol and demonstrates no alcohol-related behavior, is, nonetheless, impaired in the ability to perform the job by reason of alcoholism.

1. At the time of the decedent's discharge, there was no specific promulgated federal law or rule mandating that an employer in the nuclear power industry deny job site access to

REFERENCES

Am Jur 2d, Atomic Energy §§ 40, 45; Job Discrimination §§ 124-126, 163, 164, 166, 167, 453; Labor and Labor Relations §§ 1931, 2003.

What constitutes handicap under state legislation forbidding job discrimination on account of handicap. 82 ALR4th 26.

Handicap as job disqualification under state legislation forbidding job discrimination on account of handicap. 78 ALR4th 265.

an employee on the basis of alcoholic tendencies. The decedent's state law claim was not explicitly preempted by federal law.

2. The state law cause of action asserted under the Handicappers' Civil Rights Act was not preempted by § 301 of the Labor Management Relations Act, because resolution of the claim does not require interpretation of a collective bargaining agreement. The decedent had an independent, nonnegotiable right not to be discriminated against on the basis of handicap.

3. The trial court erred in determining whether the decedent's condition was related to his ability to perform the job solely by reference to the employer's definition of the job or the qualifications for the job.

Reversed and remanded.

REILLY, J., concurring in part and dissenting in part, disagreed with the resolution of the decedent's claim under the Handicappers' Civil Rights Act. On remand, the factual issue with regard to whether the psychological examination used as a basis to terminate the decedent was related to the requirements of his job should be resolved, but the plaintiff should not be allowed to pursue the claim of handicap discrimination, because the plaintiff denies that the decedent had an alcohol problem and the Legislature's definition of a handicap does not include situations wherein no handicap exists, but others perceive a handicap.

1. CONFLICT OF LAWS — PREEMPTION — NUCLEAR FACILITIES — RADIOLOGICAL SAFETY — CIVIL RIGHTS — HANDICAPPERS.

The federal government has preempted all regulation with regard to radiological safety in the construction and operation of a nuclear power plant; for a state law to be preempted, it must have some direct and substantial effect on the decisions concerning radiological safety levels made by those who build or operate nuclear facilities; the Handicappers' Civil Rights Act does not have such an effect so as to place it within the field of preemption, nor has Congress indicated any intent to exempt employers in the nuclear power industry from state civil rights laws (42 USC 2011 et seq., 42 USC 5801 et seq.; MCL 37.1101 et seq.; MSA 3.550[101] et seq.).

2. CONFLICT OF LAWS — PREEMPTION — LABOR MANAGEMENT RELATIONS ACT.

The Labor Management Relations Act preempts a claim based on state law only if the application of state law requires interpretation of a collective bargaining agreement; however, not every state lawsuit asserting a right relating in some way to a

provision in a collective bargaining agreement is necessarily preempted; the analysis focuses on whether the state law confers nonnegotiable state law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the state law claim is inextricably intertwined with consideration of the terms of the labor contract (29 USC 185).

3. CIVIL RIGHTS — HANDICAPPERS' CIVIL RIGHTS ACT — HANDICAP UNRELATED TO ABILITY TO PERFORM JOB.

An employer may not make the absence of a particular handicap part of a job description or make compliance with the job description a qualification for employment and then use the qualification as a basis for denying employment to or terminating the employment of a person who has such a handicap; an employer may not use such a job description as a means of avoiding the issue whether the handicap is unrelated to an employee's ability to perform the job (MCL 37.1103; MSA 3.550[103]).

*Troff, Petzke & Ammeson* (by *Charles Ammeson*), for the plaintiff.

*Butzbaugh & Dewane* (by *John E. Dewane*), for the defendant.

Before: SHEPHERD, P.J., and SAWYER and REILLY, JJ.

SHEPHERD, P.J. Plaintiff appeals as of right an August 14, 1989, order granting summary disposition to defendant. We reverse.

Plaintiff's decedent was a journeyman carpenter whose union contracted with defendant, a subcontractor, to do repair and replacement work on the steam generator at the D. C. Cook Nuclear Power Plant, which was owned and operated by Indiana Michigan Power Co. After being hired by defendant on May 2, 1988, decedent was required to pass a psychological evaluation, the Minnesota Multiphasic Personality Inventory (MMPI), in order to be granted unescorted status to work in vital

areas of the plant. If an employee's MMPI score
revealed a risk of substance abuse, he was given a
personal evaluation by a psychologist.

According to defendant, decedent's MMPI score
was unacceptably high and revealed alcoholic ten-
dencies. The psychologist who later interviewed
decedent found that, given the test results' sugges-
tion of alcoholism and decedent's acknowledgment
of classic symptoms of alcoholism (though he de-
nied being an alcoholic), there was a "high likeli-
hood" decedent was an alcoholic and therefore
should not be granted unescorted-access authoriza-
tion. Decedent's employment with defendant was
thus terminated on May 4, 1988. According to the
affidavit filed by decedent, he had previously
worked at the Cook Nuclear Plant for more than
ten years and, after being discharged by defen-
dant, he worked at another nuclear plant as a
carpenter, with unescorted access throughout the
plant.

Decedent commenced this action in December
1988, alleging that defendant's termination of his
employment, on the basis of the MMPI score and
because of a perceived handicap, alcoholism, that
was unrelated to his ability to perform his duties
as a carpenter, amounted to handicap discrimina-
tion in violation of the Handicappers' Civil Rights
Act, MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.*
Defendant thereafter moved for summary disposi-
tion, claiming decedent's state law claim was
preempted by the Atomic Energy Act, 42 USC
2011 *et seq.*, and § 301 of the Labor Management
Relations Act (LMRA), 29 USC 185. Defendant also
asserted that decedent could not factually support
his claim because his handicap was related to his
ability to perform his job. The subsequent granting
of this motion was premised on the trial court's
acceptance of defendant's arguments, particularly

that of preemption. With regard to this issue, the trial court found that Congress, through the Atomic Energy Act, had intended to remove from state regulation all matters dealing with safety in the construction and operation of nuclear power plants and, because it dealt with safety, the Handicappers' Civil Rights Act was preempted by federal law. Plaintiff, who was substituted for the decedent after his death in August 1989, claims summary disposition was improperly granted on the grounds stated by the trial court. We agree.

The first issue we must address is that of preemption—whether federal law preempted the specific state law in question here under the Supremacy Clause, US Const, art VI, cl 2. The circumstances under which state law may be preempted were recently described by the Supreme Court in *English v General Electric Co,* 495 US —; 110 S Ct 2270; 110 L Ed 2d 65, 74 (1990), as follows:

> First, Congress can define explicitly the extent to which its enactments pre-empt state law. See *Shaw v Delta Air Lines, Inc,* 463 US 85, 95-98 [103 S Ct 2890; 77 L Ed 2d 490] (1983). Pre-emption fundamentally is a question of congressional intent, see *Schneidewind v ANR Pipeline Co,* 485 US 293, 299 [108 S Ct 1145; 99 L Ed 2d 316] (1988), and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.
>
> Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the

federal interest is so dominant that the federal
system will be assumed to preclude enforcement of
state laws on the same subject." *Rice v Santa Fe
Elevator Corp,* 331 US 218, 230 [67 S Ct 1146; 91 L
Ed 1447] (1947). Although this Court has not hesi-
tated to draw an inference of field pre-emption
where it is supported by the federal statutory and
regulatory schemes, it has emphasized: "[W]here
. . . the field which Congress is said to have pre-
empted" includes areas that have "been tradition-
ally occupied by the States," congressional intent
to supersede state laws must be " 'clear and
manifest.' " *Jones v Rath Packing Co,* 430 US 519,
525 [97 S Ct 1305; 51 L Ed 2d 604] (1977), quoting
*Rice v Santa Fe Elevator Corp,* 331 US at 230 [67
S Ct 1146; 91 L Ed 1447].

Finally, state law is pre-empted to the extent
that it actually conflicts with federal law. Thus,
the Court has found pre-emption where it is impos-
sible for a private party to comply with both state
and federal requirements, see, e.g., *Florida Lime &
Avocado Growers, Inc v Paul,* 373 US 132, 142-143
[83 S Ct 1210; 10 L Ed 2d 248] (1963), or where
state law "stands as an obstacle to the accomplish-
ment and execution of the full purposes and objec-
tives of Congress." *Hines v Davidowitz,* 312 US 52,
67 [61 S Ct 399; 85 L Ed 581] (1941).

See also *People v Hegedus,* 432 Mich 598, 607, n
10; 443 NW2d 127 (1989). Because neither party
has argued that there exists express preemption or
a conflict between federal and state law, we are
concerned here with what is referred to as field
preemption.

Under the Atomic Energy Act and the Energy
Reorganization Act, 42 USC 5801 *et seq.,* the Nu-
clear Regulatory Commission (NRC) is vested with
regulatory and licensing authority over the nu-
clear field and nuclear facilities. While states re-
tain some power, such as the regulation of electri-
cal utilities with respect to questions of need,

reliability, cost, and so forth, the Supreme Court in *Pacific Gas & Electric Co v State Energy Resources Conservation & Development Comm,* 461 US 190, 212; 103 S Ct 1713; 75 L Ed 2d 752 (1983), found that "the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States." In enacting the Atomic Energy Act, said the Court, Congress intended that only "the Federal Government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant." *Id.* at 205.

Because of an increasing awareness and concern over substance abuse in the workplace and the particular danger it posed to the public when it occurred in nuclear-power facilities, the NRC published a proposed rule on August 5, 1982, that would have required, in part, that licensees establish and implement fitness for duty (FFD) programs to assure that personnel with unescorted access to protected areas were not under the influence of drugs or alcohol or otherwise unfit for duty. 47 Fed Reg 33,980. On August 1, 1984, the NRC published another proposed rule that would have required access-authorization programs for individuals seeking unescorted access to protected areas, as well as a draft regulatory guide, and invited comment thereon. 49 Fed Reg 30,726. On August 4, 1986, the NRC withdrew the proposed rule, 51 Fed Reg 27,872, and, instead, issued a policy statement. 51 Fed Reg 27,921. In the policy statement, the NRC set forth its "expectations" of licensee programs and what it considered to be an acceptable program's essential elements. The decision whether to promulgate a rule was deferred for a minimum of eighteen months to further encourage initiatives that had been taken by the industry, including the Nuclear Utility Management and Resources Com-

mittee (an agency composed of representatives from each utility operating a nuclear plant) and the Institute of Nuclear Power Operations, as long as the industry programs produced the desired results. In issuing the policy statement, though, the NRC reserved its regulatory and licensing authority. It was not until June 7, 1989, that a final rule was published, 54 Fed Reg 24,468.

Thus, at the time of decedent's discharge there was no NRC rule in effect, only a policy statement. Indiana Michigan Power Co.'s access-authorization plan, of which the psychological evaluation was a part, was instituted voluntarily, though, according to defendant, it was approved by the NRC in 1986 when it was submitted as part of a security plan.

There is no question that preemption may result not only from action taken by Congress itself, but from action of a federal agency that is within the scope of its congressionally delegated authority. *Louisiana Public Service Comm v Federal Communications Comm,* 476 US 355, 369; 106 S Ct 1890; 90 L Ed 2d 369 (1986). While Congress has expressed an intent that federal regulations supersede state law in matters of nuclear safety, the NRC had not promulgated a rule regarding the issue of FFD or access-authorization plans at the time decedent was tested and discharged. The industry was acting pursuant to voluntarily imposed guidelines, not federal regulations. How, then, can it be said that state law was preempted by federal law when there was no federal law in effect?[1]

---

[1] In *Alverado v Washington Public Power Supply System,* 111 Wash 2d 424; 759 P2d 427 (1988), cert den 490 US 1004 (1989), relied upon by defendant, the plaintiffs challenged that aspect of an FFD program mandating a urinalysis drug screening for prospective employees as violative of the state constitution. In concluding that the issue was governed by the United States Constitution, the *Alverado* court found the drug-testing program, implemented voluntarily while the NRC

Even were we to assume that any action taken by the NRC or the nuclear industry at the NRC's suggestion is governed by federal law when it pertains to safety concerns, the question remains whether the state law at issue here truly falls within the preempted field of safety. To answer this question, we must look at the motivation behind the state law and the actual effect, if any, it has on nuclear safety. *English, supra* at 77-78.

It is readily apparent that the purpose of the Handicappers' Civil Rights Act is to ensure that all persons be accorded equal opportunities to obtain employment, housing, and the utilization of public accommodations, services, and facilities. MCL 37.1102; MSA 3.550(102). The act was not directed toward the nuclear field in any greater respect than any other field or industry. It simply seeks to address and preclude discrimination on the basis of one's handicap and, in the employment setting, a handicap, as defined in the act, that is unrelated to an individual's ability to perform the duties of a particular job or position.

With regard to the issue whether this statute is

policy statement was in effect, was derived from "federal authority." The court also noted that while the NRC had not mandated the specific details of the testing program, its August 1986 policy statement indicated that adoption of an effective drug-testing program was a condition of continued licensure. To the extent *Alverado* equated a policy statement with a federal regulation, vesting it with the force and effect of a properly promulgated rule, we reject its reasoning.

While the NRC reserved its right to monitor the progress of the programs and continue its inspections and enforcement of existing rules and regulations, the policy statement did not state that implementation of an FFD or access-authorization program was a condition of licensure. Indeed, in 51 Fed Reg 27,921 Commissioner Asselstine, writing separately to express his view that a rule should have been promulgated, noted that the Edison Electric Institute guidelines developed by the industry were "optional, not mandatory" and utilities could pick and choose among the various elements, resulting in adoption of widely differing approaches, some of which might not be acceptable. The commission responded that it did not share Commissioner Asselstine's concern about "the legally non-binding character" of the policy statement.

so related to the radiological safety aspects involved in the operation of a nuclear facility that it falls within the preempted field, we note the admonishment of the United States Supreme Court in *English, supra* at 78, that "not every state law that in some remote way may affect the nuclear safety decisions made by those who build and run nuclear facilities can be said to fall within the preempted field." For a state law to fall within the preempted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels. *Id.* While the Handicappers' Civil Rights Act has an effect on those decisions in the sense that it precludes discrimination in this employment setting, as it would in any other, this is not the "direct and substantial" effect necessary to place the act within the preempted field. The statute attaches additional considerations to some of the decisions made by those who build or operate nuclear facilities just as it does to any other employer. Yet the effect on radiological safety is merely incidental, and there is no indication that, with regard to field preemption, Congress intended to exempt employers in the nuclear power industry from state civil rights laws. Accordingly, in the absence of a specific promulgated federal rule mandating the employer to deny access to decedent on the basis of alcoholic tendencies, we find that plaintiff's state law claim is not preempted and that the trial court erred in concluding otherwise.

We further agree with plaintiff that the court erred in its determination that plaintiff's claim is preempted by § 301 of the Labor Management Relations Act. The court's ruling was premised on a finding that, while decedent had not pleaded a cause of action dependent upon interpretation of a

collective bargaining agreement, resolution of the matter was "inextricably intertwined" with the terms of the labor contract because that contract included an agreement on the part of decedent's union that employees must successfully complete the psychological evaluation.

Section 301 of the LMRA will preempt a claim based on state law only if the application of state law requires interpretation of a collective bargaining agreement. *Lingle v Norge Division of Magic Chef, Inc,* 486 US 399, 413; 108 S Ct 1877; 100 L Ed 2d 410 (1988). As the United States Supreme Court has stated, however, not every state lawsuit asserting a right that relates in some way to a provision in a collective bargaining agreement is necessarily preempted by § 301. *Allis-Chalmers Corp v Lueck,* 471 US 202, 220; 105 S Ct 1904; 85 L Ed 2d 206 (1985). The analysis focuses on whether the state law in question confers nonnegotiable state law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the state law claim is inextricably intertwined with consideration of the terms of the labor contract. *Id.* at 213.

Having reviewed the complaint and the contract provisions provided to us, we find that the state law cause of action asserted in this matter under the Handicappers' Civil Rights Act does not require interpretation of the collective bargaining agreement. Though decedent's union may have agreed to the requirement that employees pass a psychological assessment before being granted unescorted access, decedent, like all other Michigan employees, had an independent, nonnegotiable right not to be discriminated against on the basis of handicap. See, e.g., *O'Shea v Detroit News,* 887 F2d 683 (CA 6, 1989); *Smolarek v Chrysler Corp,* 879 F2d 1326 (CA 6, 1989) (en banc).

The final ground on which summary disposition was premised was the trial court's finding that decedent was not handicapped within the meaning of the Handicappers' Civil Rights Act because, under the terms of the contract between defendant and decedent's union, workers were only qualified to work at the plant if they obtained unescorted status. Since decedent was refused such status because he failed the psychological evaluation, the trial court ruled that his alleged "handicap" was related to his ability to perform his job. See *Carr v General Motors Corp,* 425 Mich 313; 389 NW2d 686 (1986).

Before its amendment in June 1990, MCL 37.1103(b); MSA 3.550(103)(b) defined the term "handicap" in pertinent part as follows:

> "Handicap" means a determinable physical or mental characteristic of an individual or a history of the characteristic which may result from disease, injury, congenital condition of birth, or functional disorder which characteristic:
>
> (i) . . . is unrelated to the individual's ability to perform the duties of a particular job or position, or is unrelated to the individual's qualifications for employment or promotion.

Assuming, without deciding, that decedent was an alcoholic and that alcoholism was a type of physical or mental characteristic contemplated by subsection b, the question whether that "handicap" was unrelated to the individual's ability to do the job was not to be determined solely by reference to the employer's definition of the job or the qualifications for the job. That is, "an employer may not make the absence of a particular handicap part of the job description, make compliance with the job description a qualification for employment, and then use the qualification as a basis for

denying employment to [or for termination of] one who has that handicap. Furthermore, an employer may not use such a job description as a means of avoiding the issue of whether the handicap is unrelated to an employee's ability to perform the job." *Means v Jowa Security Services,* 176 Mich App 466, 474; 440 NW2d 23 (1989). Yet, in the present matter, the trial court determined there was no genuine issue of material fact with regard to the question whether decedent's condition was related or unrelated to his ability to perform the job solely by reference to the standard established by defendant. This was error.

However, in ruling on this issue, the trial court failed to address the preliminary question whether alcoholism is a "handicap" as defined by the statute. We note that the statute has since been amended to specifically exclude from the definition of "handicap" in the employment setting "[a] determinable physical or mental characteristic caused by the use of an alcoholic liquor by that individual," if that characteristic "prevents that individual from performing the duties of his or her job." MCL 37.1103(f)(ii); MSA 3.550(103)(f)(ii). This new language is not controlling in the instant matter. The question whether alcoholism is a handicap must be determined under the old statutory language.[2]

In sum, we find that summary disposition was

---

[2] Nevertheless, it is interesting to note that even under the amended statute alcoholism is excluded from the statute's protection only if it prevents the employee from performing the duties of the job. Thus, it is arguable under the amendment that employees who are classified as alcoholics, but who are not prevented from performing their jobs, have a handicap that is protected under the statute. As indicated, we need not address that issue because it is the former statute that applies. It would appear that under both versions of the statute a recovering alcoholic (who is still considered to be an alcoholic) may be protected because the condition may be one that does not affect job performance.

improperly granted to defendant. The state law cause of action asserted in this matter was not preempted by the Atomic Energy Act or § 301 of the LMRA. Nor can it be said that merely because defendant made the absence of alcoholism a condition of employment, such a condition was related to decedent's ability to perform his job. Allegations were made that for many years decedent performed well on his various jobs in the nuclear industry and that, after being terminated by defendant, decedent obtained unescorted status with another employer in the nuclear industry. This would raise a question of fact whether the particular propensities of the decedent affected his ability to do the job. Of special note is the fact that no claims were made that decedent was ever under the influence of alcohol on the job or that his alcoholic tendencies had had an impact on his job efficiency.

Finally, it has yet to be determined whether alcoholism is a "handicap" under the act. On remand, the trial court will address that issue. We decline to do so because it was not seriously argued below. Nevertheless, we note that the employer and the policy statement in question characterize alcoholism as a handicap and appear to argue that it is a handicap that necessarily affects one's ability to do the job. The trial court will have to address the issue whether one who has alcoholic tendencies, but who does not come to work under the influence of alcohol and who demonstrates no alcohol-related behavior, is, nevertheless, impaired in ability to perform the job by reason of alcoholism.

Reversed and remanded. We do not retain jurisdiction.

Sawyer, J., concurred.

REILLY, J. *(concurring in part and dissenting in part).* I agree that at the time of decedent's termination in May 1988 the Nuclear Regulatory Commission (NRC) had not asserted exclusive authority over the criteria to be used to ascertain whether persons who abused alcohol were safety risks when employed at a nuclear facility. At that time, the NRC was involved in the process of evaluating programs to assess and respond to any safety risks posed by persons who had a history of being habitual and excessive users of alcohol without rehabilitation or who used alcohol at the work site.

In 1977 and again in 1984, the NRC, pursuant to its powers, proposed a rule that established a screening process to determine whether an individual should be given unescorted-access status before being permitted by a licensee or contractor to work at a protected area in a nuclear plant.[1] It should be noted that the defendant's use of the Minnesota Multiphasic Personality Inventory as part of its psychological evaluation plan to determine whether decedent qualified for unescorted-access status was consistent with the extensive screening process to detect alcohol abusers being considered by the NRC in its proposed authorized-access rule.

On August 5, 1982, the commission proposed a different rule to adopt a program to establish and implement controls designed to assure that personnel who had been granted unescorted-access status were not under the influence of drugs or alcohol or otherwise unfit for duty.[2] On August 4, 1986, that proposed rule was withdrawn. In its stead, the NRC

---

[1] For a history of the Access Authorization Program and the 1977 and 1984 proposed rules, see 42 Fed Reg 14,880 and 49 Fed Reg 30,726.

[2] 47 Fed Reg 33,980.

issued a policy statement[3] declaring that nuclear power plant licensees would be expected, through their own initiative, to develop programs to determine fitness for duty that would make unacceptable the sale, use, or possession of alcohol or illegal drugs within protected areas and would prohibit personnel from being under the influence of drugs or alcohol so as to affect their ability to perform their duties in anyway related to safety. At a minimum, with respect to alcohol, the programs were to include a provision that the use of alcohol within the protected area would result in immediate revocation of access and possible discharge. In addition, they were to include effective monitoring and testing procedures to provide reasonable assurance that personnel with access to vital areas were fit for duty.

None of these actions indicate an intent by the NRC to preempt state laws protecting persons against discrimination in employment practices that are unrelated to that person's ability to safely perform the duties of the job. Further, the purpose behind the state law is to protect the employee from discrimination, not to regulate nuclear safety. The state law does not have a direct and substantial effect on decisions concerning radiological safety levels made by those who build or operate nuclear facilities. *English v General Electric Co*, 495 US —; 110 S Ct 2270, 2275; 110 L Ed 2d 65 (1990); *Ackison v Detroit Edison Co*, 751 F Supp 1245 (ED Mich, 1990). Therefore, I concur that the plaintiff's action is not preempted by the Atomic Energy Act, 42 USC 2011 *et seq.*, or the Energy Reorganization Act 42 USC 5801 *et seq.*

I also agree with the majority that the plaintiff's claim is not preempted by § 301 of the Labor Management Relations Act 29 USC 185.

[3] 51 Fed Reg 27,872 and 51 Fed Reg 27,921.

I am compelled to dissent, however, with respect to the majority's resolution of the plaintiff's claims under the Handicappers' Civil Rights Act (HCRA), MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.* The decedent alleged two violations of the HCRA in his complaint: (1) that he was terminated on the basis of a psychological examination that was not directly related to the requirements of his specific job, MCL 37.1202(1)(d), (e); MSA 3.550(202)(1)(d), (e), and (2) that he was terminated because of a perceived handicap, MCL 37.1202(1)(a), (b); MSA 3.550(202)(1)(a), (b).

While I agree that the plaintiff is entitled to resolve the factual issue with regard to whether the psychological examination used as a basis to terminate the decedent was related to the requirements of his job, I do not believe that plaintiff is entitled to pursue the claim of discrimination based upon a *perceived* handicap.

Plaintiff denies decedent had an alcohol problem. This Court has held that the Legislature's definition of handicap does not include situations wherein no handicap exists, but others perceive a handicap. *Sanchez v Lagoudakis,* 184 Mich App 355; 457 NW2d 373 (1990).[4]

I would remand for further proceedings with respect to count I only.

---

[4] I have previously taken a position to the contrary, but was unable to persuade the other members of the panel. *Bay City Fire Dep't v Dep't of Civil Rights ex rel Roznowski,* 182 Mich App 145; 451 NW2d 533 (1989). (REILLY, J., concurring.)