Mark CROCKER, Appellant,

v.

SYNPOL, INC. and Dr. Houston G. Hamby, Appellees.

No. 09 86 232 CV.

Court of Appeals of Texas, Beaumont.

June 18, 1987.

Rehearing Denied July 15, 1987.

Dale K. Hanks, Townsley, Bush, Lewis & Ramsey, Beaumont, for appellant.

T.J. Wray, Fulbright & Jaworski, Houston, for appellees.

## OPINION

BROOKSHIRE, Justice.

Appeal from the granting of a joint Motion for Summary Judgment. The trial court granted Dr. Houston G. Hamby's Motion for Summary Judgment and Synpol, Inc.'s Motion for Summary Judgment.

The background of the dispute arises out of the termination of Mark Crocker's employment with Synpol, Inc. After certain meetings between Crocker, his union, and Synpol, Crocker requested and was allowed to resign his employment.

Before he resigned from his employment, the Appellant was confronted with some laboratory tests by way of urinalysis. These laboratory results purportedly reflected his use and consumption of marihuana. The use of marihuana was contrary to the policies of Synpol, Inc. However, it is interesting to relate how Crocker arrived at the clinic or office of Dr. Houston G. Hamby. Crocker had originally gone to a first aid station that was presided over by a nurse. Crocker said that he had injured his back on the job and was seeking some relief from the discomfort and pain of his job-incurred back injury. Then, the nurse decided to send him to the office of Dr. Hamby, who was a physician under a contractual arrangement with Synpol, Inc., and two other corporate employers. Dr. Hamby reported the findings of the urinalysis test, reflecting some trace of marihuana, to Synpol. The results were given to Synpol at once.

Thereafter, several conferences were held among Synpol, Inc., the local Oil, Chemical and Atomic Workers' Union representing Crocker, and Crocker himself taking part. Crocker's employment was covered and governed by a collective bargaining contract between Synpol, Inc., and his own local union, being O.C.A.W. Local 4–228. The local union appointed a committee that consulted with Crocker. Some member of the committee asked the Appellant if he had smoked marihuana on the day of the giving of the urine specimen and the Appellant replied "No". Apparently, some other member of the committee asked him how long it had been since the Appel-

lant had smoked marihuana and Crocker then replied that it was "between a week to two weeks".

Then Crocker testified that he was told by a member of his own local union's committee:

"He said, 'Now, this doesn't really mean that you're guilty or nothing.' I said, 'Well, I know I haven't smoked—' I thought that it was too long for it to be in my system. He said, 'Well, with this evidence, you don't stand very much of a chance of proving. It's your word against their scientific facts, plus your record showing that you have already gotten busted for marijuana one time. With this evidence, we just really don't think you have any chance, whatsoever, of beating arbitration.' "

But the union was willing to take the matter to arbitration. Mark Crocker testified that he was with the union committeemen about 20 to 30 minutes. Crocker further testified that the people on the committee appeared to be sympathetic to him. The matter was never taken to arbitration or to a grievance procedure.

Apparently, after Crocker decided to terminate his employment by way of a resignation, he had a further meeting with the union committeemen. The Appellant was also familiar with the grievance procedure and knew about it. He said that he did not have any reason to believe that any of the members of the union committee had any personal animosity towards him. The Appellant decided not to pursue the grievance and arbitration clauses of the collective bargaining agreement that covered his employment. The local union is not a party to this appeal, nor was it a party in the trial court.

### The Collective Bargaining Contract

Article XI sets out, in detail, the "Grievance & Arbitration Procedure". Article XVIII, entitled "Physical Examination" provides, inter alia, concerning "Periodic Check Ups" that:

"1. c. Employees will cooperate in submitting to annual physical examinations as scheduled by the Company. Such examinations will be at Company expense."

Also, concerning "Lay Offs", the contract provides:

"1. a. In the event it becomes necessary to lay off employees, each employee will be required to submit to a physical examination at Company expense prior to the effective date of layoff."

Also, 2. c. provides:

"For the purpose of determining an employee's physical condition and fitness for performing his regular job or any to which he may be assigned, during any period of employment, the Company may require a check examination by either the Company physician or any other reputable physician selected and paid by the Company."

2. d. provides:

"If an employee is unwilling or refuses to accept the physician's verdict of any physical examination, provided for in Section 2 of this Article, he may select and be examined by any reputable physician and present to the Company a certificate attesting to the results thereof; this examination to be paid for by the employee...."

Initially, Crocker went to the nurse on duty at the first aid station, complaining of an injury to his back. Then, at the request of the nurse on duty, the company's manager of health and safety observed Crocker for several minutes and the manager concluded that Crocker appeared to be more sleepy and drowsy than hurt. Thereafter, the manager of safety suggested that a drug screen test be made. He suggested the same to Dr. Hamby. This communication to Dr. Hamby was by telephone. Mildred Holmes, the company nurse, had previously called Mr. Johnson, the safety manager, to come look at Crocker. After observing Crocker, he instructed the nurse to call Dr. Hamby and send Crocker over to find out what was wrong. A security guard accompanied the Appellant to Dr. Hamby's office, which was at another location.

We conclude that the trial judge was correct in granting the Motion for Summa-

ry Judgment in favor of, and filed by, Synpol, Inc. We determine that Crocker's claim for wrongful discharge against Synpol, Inc., was preempted by the federal Congress under the federal labor law. It is clear and, indeed, uncontradicted and undisputed that the Appellant was employed by Synpol, Inc., under an appropriate collective bargaining unit. This collective bargaining unit was covered and governed by a collective bargaining contract. The collective bargaining contract contains specific provisions dealing with physical examinations required by the company. This collective bargaining agreement also regulates the discharge of employees. This same agreement contains a grievance and arbitration procedure under which an employee may proceed when alleging an unjust action by the company, especially a termination or a resignation as an alternative to firing.

■ The U.S. Congress has mandated and has maintained a uniform, national labor policy. In order to effectively maintain such a uniform national labor policy, the Congress has preempted state court proceedings that threaten to interfere with the congressional labor policy. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Regardless of whether his cause of action is described by the Appellant as being one in contract or one in tort, if the determination of a pleaded claim under State law is, in a meaningful way, substantially dependent upon an analysis, interpretation and construction of the terms of the collective bargaining agreement, such claim is preempted by the federal labor law. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). It is undisputed, under this record, that the Appellant did not exhaust the grievance procedures established in the collective bargaining agreement prior to bringing this state court action. Indeed, he did not start a grievance procedure.

In *Allis-Chalmers Corp., supra*, an employee had allegedly sustained a non-occupational injury to his back. The employee brought a Wisconsin state court action,

sounding in tort, against his employer and its insurer in which he alleged bad faith in the handling of his claim for his back injury which had its basis in a disability plan included in a collective bargaining agreement. He sought damages. The employee did not exhaust or follow through with the grievance procedure established in the collective bargaining agreement. The case was appealed after a ruling on cross-motions for summary judgment.

The trial court, as well as the Wisconsin court of appeals, ruled in favor of the employer and the insurer holding that the employee had stated a claim under Sec. 301 of the Labor Management Relations Act, 29 U.S.C.A. Sec. 185 (1973). It was further concluded, in the alternative, that even if the claim was deemed to arise under state law, it was preempted by the federal labor law. The Wisconsin Supreme Court reversed.

The Supreme Court of the United States granted a writ of certiorari and, in a unanimous opinion of the eight participating justices, held that when a resolution of a state law claim is substantially dependent on the analysis of the terms of a collective bargaining agreement then that claim must be treated either as a Section 301 claim or dismissed as preempted by the federal labor law. The United States Supreme Court's ruling was further to the effect that the complainant, Lueck, should have had his complaint dismissed for failure to make use of the grievance procedure.

■ We conclude that the case sub judice is more substantially dependent on analysis of the terms of the collective bargaining contract than a tort action for the bad faith handling of a non-occupational back injury under a disability plan. The salient facts in our case deal directly with the termination of employment and directly with the grievance and arbitration procedures. We deem that Article XI, "Grievance & Arbitration Procedure", is set out clearly in the collective bargaining contract. If the arbitration procedure is followed, it is provided that the arbitrator's findings and decisions shall be presented in writing and shall be conclusive, final and

binding on both parties. We think that the grievance and arbitration article and its sections and subsections, which are in the collective bargaining agreement, are very important and are necessarily crucial to the uniform federal labor policy. These procedures are properly characterized as being vital to the uniform federal labor policy. *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). In *Allis-Chalmers Corp., supra,* the court wrote, in 471 U.S. 202, at page 209, 105 S.Ct. 1904, at page 1910, 85 L.Ed.2d 206, at page 214:

"Section 301 of the LMRA states:

'Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties....' 29 USC Sec. 185(a) [29 USCS Sec. 185(a)]."

We think that the federal law is now settled, which we are constrained to follow, that individual members of a collective bargaining unit may not fail to abide by the grievance and arbitration procedures for the reason that this practice, in turn, would cause grievance procedures and arbitration procedures to lose their vitality and effectiveness. Such a practice would probably diminish one of the main tenets or reason for federal labor contract law that favors arbitrators and arbitration rather than state court resolution of disputes like the one before us. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

### The Doctor's Motion

We determine that the trial judge fell into error in granting the Motion for Summary Judgment in favor of the doctor. The Appellant first went to the first aid station for treatment to his back. That is all that he clearly knowingly consented to. He was later transferred, in the company of a guard, to Dr. Hamby's clinic. Just before the transfer, a Mr. Johnson, who was the manager of safety, observed Crocker. Johnson testified that Crocker had his head in his hands on the desk when Crocker was asked what was the matter. Johnson said Crocker made a half effort to raise his head and complained of his back hurting and put his head back down on the desk. At that point, Johnson decided to send Crocker over to Dr. Hamby to find out what was wrong.

It is correct, under the collective bargaining agreement, that the company had the right to have the employees undergo certain physical examinations at certain times, but we conclude that this meant that the employees at least acquiesced in these physical examinations and at least the employees knew what was going on and appreciated the fact that they were being examined at the orders of the company. We think there is a strain or string of evidence in this case that Crocker may not have consented, or realized, or appreciated that he was being tested for drugs. There was no written consent. The evidence is in conflict as to whether or not there was a verbal consent given by Crocker. However, under this record, a verbal consent may not have been valid or meaningful.

Dr. Hamby testified that the Appellant probably had an injury but he was completely "zonked out on something". Dr. Hamby freely admitted that he did not know what the Appellant's condition was and that he could not really treat him other than to administer a medical sonulator. The doctor described the sonulator as a kind of muscle stimulation treatment to relax the muscles. The doctor further swore that no muscle relaxers or pain medicines or "anything like that" could be given to Appellant "because it would be dangerous to his well-being". Then, about 15 or 30 minutes passed. Johnson called back and asked the doctor if he would perform a urine drug screen test on Appellant. The doctor testified that he had no objection as long as the patient had no objection. Then the doctor testified that he told the nurse, Mrs. Howard, that the company would like a drug screen test on the Appellant and, if the Appellant was willing, it was alright and for her to go ahead and obtain a specimen. At this point, apparently, the nurse and Appellant went into another area or

another room and the doctor did not see the patient give the specimen. Apparently the doctor did not see Crocker again that day. The doctor could not testify definitely as to the Appellant's condition at the time of the giving of the urine specimen. Dr. Hamby further testified, in substance, that Crocker was badly impaired and could not communicate adequately and the doctor further stated that he realized, as a possibility at least, that the Appellant did not have the capacity to give any kind of a consent, either written or oral. The doctor agreed: "My duty is always first to the patient, and I believe you can check that, and that's always true."

Crocker apparently did not give any separate release permitting the doctor to release any confidential communication, or any kind of information, to Synpol, Inc., concerning the urinalysis. The doctor testified that the Appellant was brought in on a litter with both side bars raised because the nurse was afraid that Crocker was going to fall off. The doctor let one side bar down and asked Crocker if he could sit up, which he did very slowly, but kept his eyes shut and his head "over." The doctor then said:

"... but he was so far out of it that he just kept falling back over. . . .

. . . .

"I let him lie back down, and he went back to sleep."

The Appellant, at oral submission, as well as in the brief, argues that part of the urinalysis showed an antihistamine or other sympathetic amine, probably "Sudafed" and also metabolite of marihuana.

The doctor testified that if drugs were involved there was a possibility that the Appellant's job could be terminated. The doctor stated that there was always a possibility of termination and that he certainly did not know what disciplinary action was going to take place or if there would be any disciplinary action. We determine that material fact issues were raised in connection with the duties and obligations that Dr. Hamby owed his patient.

 We feel constrained to conclude that a material fact issue was raised under this unique record by Dr. Hamby's reporting the results of the urinalysis to Synpol, Inc. Generally speaking, a physician-patient relationship is, in our state, considered to be a confidential relationship and the communications connected therewith are not intended to be discussed with third parties other than those actually present at the time of the consultation or examination. *TEX.R.EVID. 509(a)(1), (2), (3).*

*TEX.R.EVID. 509(a)(3)* reads as follows:

"A communication is 'confidential' if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician, including members of the patient's family."

And this privilege of confidentiality may be claimed by the patient or a representative of the patient acting on the patient's behalf. *TEX.R.EVID. 509(c)(1).* Indeed, the physician may only claim the privilege on behalf of the patient but, apparently, not for the physician's own purposes. *Rule 509(c)(2).*

*TEX.R.EVID. 509(b)(2)* reads as follows:

"Records of the identity, diagnosis, evaluation, or treatment of a patient by a physician that *are created* or maintained by a physician are confidential and privileged and may not be *disclosed.*" (emphasis added)

But, under *TEX.R.EVID. 509(d),*

"Exceptions to confidentiality or privilege in court or administrative proceedings exist:

"(1) when the proceedings are brought by the patient against a physician, including but not limited to malpractice proceedings, and in any license revocation proceeding in which the patient is a complaining witness and in which disclosure is relevant to the claims or defense of a physician; ..."

Query: Does *TEX.R.EVID. 509(d)(1)* abrogate the bringing of suit by patient

against his physician for breach of confidentiality or privilege? We conclude the answer is no because of the strong, rigorous language of *Rule 509(a), (b), and (c)*. The disclosure in this case was made prior to any court or administrative proceeding.

*TEX.R.EVID. 509(e)(1)* sets forth:

"Consent for the release of privileged information must be in writing and signed by the patient ... provided that the written consent specifies the following:

"(A) the information or medical records to be covered by the release;

"(B) the reasons or purposes for the release; and

"(C) the person to whom the information is to be released."

Appellees, Synpol, Inc., and Dr. Hamby, argue that the Medical Practices Act specifically provides that a physician may disclose communications and records because Synpol, Inc., was paying the doctor's fees. The Appellees cite *TEX.REV.CIV.STAT. ANN. art. 4495b, Sec. 5.08* (Vernon Supp. 1987), entitled "Physician-patient communication" and subsections *(h)(4)* and *(6)* of *Sec. 5.08*, General and Special Laws, First Called Session, 67th Leg. 1981, Ch. 1, p. 1, p. 31–33, codified as *TEX.REV.CIV.STAT. ANN. art. 4495b, sec. 5.08*.

*Sec. 5.08(a)* states:

" 'Communications between one licensed to practice medicine, *relative to or in connection with any professional services as a physician to a patient, is confidential and privileged and may not be disclosed....* ' " (emphasis added)

Also, *Section 5.08(h)(4) and (6)* read as follows:

" 'Exceptions to the privilege of confidentiality, in other than court or administrative proceedings, allowing disclosure of confidential information by a physician, exist only to the following:

....

" '(4) those parts of the medical records reflecting charges and specific services rendered when necessary in the collection of fees for medical services provided by a physician or physicians or professional associations or other entities qualified to render or arrange for medical services;

....

" '(6) individuals, corporations, or governmental agencies involved in the payment or collection of fees for medical services rendered by a physician ...' "

We decide neither of these subsections govern our case. These questions or issues are simply not in our case. Dr. Hamby was paid about $2,000.00 a month by Synpol, Inc.

■ *Sec. 5.08(h)(6)* certainly does not permit the disclosure of any confidential information for the purpose of disciplining, firing or terminating an employee.

An uncertainty arises as to whether *Sec. 5.08* has been repealed or only limited to non-judicial disclosure circumstances. See *TEX.REV.CIV.STAT.ANN. art. 4495b, sec. 5.08* (Vernon Supp.1987), wherein the section is shown to have been "repealed by Texas Rules of Evidence, effective September 1, 1983 (Acts 1939, 46th Leg. p. 201, sec. 1)", etc. Compare TEX. RULES OF CT. '86 State Pamph. (West Desk Copy) wherein Comment under *TEX.R.EVID. 509* reads as follows:

"This rule only governs disclosures of patient-physician communications in judicial or administrative proceedings. Whether a physician may or must disclose such communications in other circumstances is governed by TEX.REV. CIV.STAT.ANN. art. 4495b, Sec. 5.08."

*The Jurisdiction Issue*

The Appellees vehemently argue and urge that this appeals court has no jurisdiction. In connection therewith, they point out that the district judge signed, and filed and had entered an order dated October 23, 1985. This order states that it was the opinion of the trial court that the Plaintiff's (Mark Crocker's) Motion for Partial Summary Judgment should be denied. However, in the same order, the district judge ordered, adjudged and decreed that "Defendant's Motion for Summary Judgment

be, and it is hereby, Granted." Which Defendant's motion is not revealed.

About eleven months later, on September 29, 1986, the same district court entered an "Order Nunc Pro Tunc". This order recited that the court was merely correcting a clerical error and that the prior order of October 23, 1985, was not in conformity with the court's ruling on such date and that order should be reformed to accurately reflect the court's ruling.

Then, the court recited, based on its own recollection, the following fact finding:

"2. That on October 23, 1985 the Court did not consider defendants' cross-motion for summary judgment, for such motion had not yet been filed as of that date, such motion having been filed no earlier than October 31, 1985; ..."

Hence, the trial court determined that it did not rule on the Defendants' Cross-Motion for Summary Judgment in the order of October 23, 1985.

■ This matter causes us real concern. Certainly, the court was changing the decretal part of the order, which is usually a judicial act. After a trial court loses jurisdiction over its order, it retains plenary power to correct only clerical errors made in entering the order. However, it cannot correct judicial errors made in rendering the final judgment or order. *Escobar v. Escobar*, 711 S.W.2d 230 (Tex.1986); *Comet Aluminum Company v. Dibrell*, 450 S.W.2d 56 (Tex.1970).

■ It is now well settled that a judicial error is that type of error which occurs in the rendering of a judgment as distinguished from the entering of a judgment. *Knox v. Long*, 152 Tex. 291, 257 S.W.2d 289 (1953); *Petroleum, Etc., Corp. v. First Nat. Bank*, 622 S.W.2d 152 (Tex.App.—Fort Worth 1981, writ ref'd n.r.e.). Necessarily, in deciding whether an attempted correction is a correction of a judicial error or clerical error, we are required to look to the judgment or order that was actually rendered and not to the judgment or order that should or might have been rendered. *Coleman v. Zapp*, 105 Tex. 491, 151 S.W. 1040 (1912). Thus, even if a court renders incorrectly it cannot alter a written judg-

ment which precisely reflects an incorrect rendition. *Love v. State Bank & Trust Co. of San Antonio*, 126 Tex. 591, 90 S.W.2d 819 (1936); *Shepherd v. Estate of Long*, 480 S.W.2d 51 (Tex.Civ.App.—Fort Worth 1972, writ ref'd n.r.e.). The decision of whether an error in a judgment or order is a judicial or clerical one is a question of law. *Finlay v. Jones*, 435 S.W.2d 136 (Tex. 1968).

■ Actually, we think the order of October 23, 1985, was a hybrid order in the sense that part of it was judicial action and part of it was clerical action; but as to the granting of the Defendants' Cross-Motion for Summary Judgment, there was certainly error preponderating towards clerical error for two reasons. Number one, in the order of October 23, 1985, the court speaks of only one Defendant's Motion for Summary Judgment. Here, we have two separate defendants, Synpol, Inc., and Dr. Houston G. Hamby. It is further true that the two defendants filed their Cross-Motion for Summary Judgment using this language:

"NOW COME Synpol, Inc. and Dr. Houston G. Hamby, Defendants herein, and file this their Cross-Motion for Summary Judgment...."

This Cross-Motion for Summary Judgment, filed by both of the Appellees, was not in the Clerk's office until October 31, 1985, and, indeed, the certificate of service of this joint motion, filed by the able attorney for both Synpol, Inc. and Dr. Hamby, certifies that the cross-motion was not served on the other side until October 31, 1985. Hence, we cannot see how the trial court passed upon a motion that was not before it, not in the clerk's file, and had not been served on the opposite side. Hence, we overrule this contention of the Appellees.

We reverse the judgment of the trial court in favor of Dr. Houston G. Hamby and we remand the cause for a trial on the merits as to the doctor. We affirm the judgment of the trial court in favor of Synpol, Inc.

AFFIRMED IN PART AND RE-VERSED IN PART.