## GULF STATES UTILITIES COMPANY, Appellant,

v.

## Lemuel R. McMILLON, Jr., Appellee.

### No. 09–87–021 CV.

Court of Appeals of Texas, Beaumont.

Nov. 5, 1987.

Rehearing Denied Nov. 25, 1987.

---

John W. Newton, III, Orgain, Bell & Tucker, Beaumont, for appellant.

David A. Brandom, Umphrey, Swearingen & Eddins, Port Arthur, for appellee.

OPINION

BROOKSHIRE, Justice.

Lemuel R. McMillon, Jr. brought suit against his employer, Gulf States Utilities Company (Gulf States), alleging that Gulf States breached its contract of employment with him. McMillon contended that Gulf States had unlawfully *garnished* a portion

of *his wages*, in violation of *TEX.REV.CIV. STAT.ANN. Art. 4099* (Vernon 1966) and *TEX.CONST. Art. 16, Sec. 28* (Vernon Supp.1987).

McMillon contended that the unlawful garnishment of a portion of his wages came about when Gulf States withheld $133 per week from his paycheck in an attempt to circumvent the Texas Workers' Compensation Law. McMillon alleged he had sustained an accidental, personal injury to his left knee in the course and scope of his employment for Gulf States and that Texas Employers Insurance Association had begun paying him weekly compensation benefits in the sum of $133 for the loss of the use of his left leg. These weekly compensation benefits began on or about February 3, 1981, and continued to on or about May 9, 1983. McMillon had received 4 surgical operations on his knee.

In a bench trial, the Court found as a fact that McMillon was represented by Local Union 2286, the International Brotherhood of Electrical Workers, a labor union certified by the National Labor Relations Board and that, at all times material hereto, there was in full force and effect a collective bargaining labor contract which was negotiated by the electrical workers' union and Gulf States. The Bench also found that Gulf States had breached the labor contract by failing to pay McMillon the contractually specified rate of pay contained in the collective bargaining agreement.

Previously, McMillon had brought a third-party action lawsuit against Southwestern Bell Telephone Company in which Gulf States was named as a third-party defendant. In this last named suit, McMillon took, basically, the same position that he had in the compensation matter. He maintained that he was unable to perform the ordinary duties of his employment and was only physically able to do certain types of light work or to perform a sedentary job. His suit against Southwestern Bell was in the federal court. It was settled for a substantial figure. At settlement, L.R. (Randy) McMillon, the Appellee, and his wife, Tana Angelina Flies McMillon, gave a full and final release and an indemnity agreement. The only exception to the release reads as follows:

"The undersigned, L.R. 'RANDY' McMILLON, and wife, TANA ANGELINA FLIES McMILLON, specifically agree that this release does not include L.R. 'RANDY' McMILLON's cause of action alleged against GULF STATES for breach of contract of employment for *unlawfully garnishing a portion of L.R. 'RANDY' McMILLON's wages* in violation of article 4099, Vernon's Annotated Texas Civil Statutes, and article 16, section 28 of the Texas Constitution. All other claims, causes of action, and demands which L.R. 'RANDY' McMILLON, and wife, TANA ANGELINA FLIES McMILLON, may now have or may have in the future against GULF STATES are released, extinguished, and forever discharged.

"The undersigned have read this Release and Indemnity Agreement before signing it, understand it, and fully understand that this is a FULL AND FINAL SETTLEMENT, and have executed the same on this the 10th day of April, 1985." (Emphasis added)

Both Randy McMillon and his wife, Tana, stated that they had read the release and that the same had been fully explained to them by their attorney.

The I.B.E.W., at all material times, had been the exclusive bargaining agent for the employees of Gulf States. An integral and vital part of the labor-management agreement was a coordination plan. Generally, the coordination plan provides that an injured employee may return to a job with less strenuous duties and obligations of performance while being paid the equivalent of his salary and, also, receive full employee benefits.

■ Article XV (of the Labor–Management Bargaining Contract), entitled "Benefits to Employees" provides:

"The Employer agrees to continue during the term of this Agreement:

. . . .

"(e) An employee's participation in any benefit plan shall not be reduced on ac-

count of Workmen's Compensation payments coordinated with his salary."

The coordination plan, or the policy of coordinating an injured employee's salary, was described as a situation where an employee, who was injured while working for Gulf States, and who was unable to perform the job for which he was employed at the time he was injured, had the assurance that the amount of money he was making at the time he was injured would not be reduced. The injured employee would receive his compensation plus a salary figured so that his income was *not* reduced. Nor would any of the employee's benefit plans, to which the wage scale was coordinated, be reduced. Such plans were the thrift plan, the life insurance plan, the retirement plan and other benefits.

We perceive Article XV(e), by reference and by necessary implication, arguably covers this coordination plan. Hence, we decide this matter is a part of the collective bargaining agreement and, in fact, is a very important part of the collective bargaining agreement as a practical matter.

It is glaringly clear that any dispute over any part of the labor agreement has to go to grievance and arbitration under the very agreement, itself.

Article VI concerns grievances and generally defines a grievance as any dispute that may arise between one or more employees or the union and the employer involving the proper application of the agreement. This same Article VI sets out the specific steps of processing grievances. Article VI, Section 5, specifically provides:

"Any grievance not presented or thereafter processed within the prescribed time limits specified above will be deemed to no longer exist...."

We deem Article VI, concerning grievances, has an important standing separate and apart from Article VII dealing with arbitration.

The Appellee says that his complaint was not subject to arbitration, since he claimed the change in his salary and wage rate was set out in "Exhibit A". He argues "Exhibit A" is excluded from arbitration. Although difficult to read in this record, this "Exhibit A" clearly demonstrates that it refers to general classifications of work, such as the rate all head firemen make, all switchboard operators make, all turbine engineers make, all equipment operators make and all second firemen make.

It is undisputed that McMillon did not take his matter to either the grievance procedure or the arbitration procedure. The said "Exhibit A" deals with salaries and wage rates by classifications and has a meaning that all personnel or employees in that classification are entitled to the rate of pay as set out in "Exhibit A". These rates of pay are contractual and they are negotiated virtually every time a new collective bargaining agreement is discussed. We decide that "Exhibit A" does not apply to the individual situation of McMillon.

The record reflects that there has been an understanding between the labor organization and Gulf States as to what the coordination plan means and that there has been no dispute about it and this coordination plan has been a part of the agreement for many years. The same coordination plan has been the custom and practice of Gulf States and the union, itself, for over 25 years and it is specifically referred to in the formal, written, labor management contract. In fact, the record shows that it was at the union's insistence that the coordination plan was included by reference in the collective bargaining contract. This practice and custom had been put in effect in 1941 or 1942 and had been followed ever since. It had been reaffirmed in 1966 or 1968 and the following years. The record also reflects that Article XV, paragraph (e), was bargained-for language and a bargained-for provision by and between the I.B.E.W. and Gulf States. That language and provision were the result of negotiations taking place across the bargaining table.

It is undisputed that McMillon did not enter into the grievance procedures required by the contract, nor did the I.B.E.W. There was no attempt made at following the grievance procedures. Further, neither the I.B.E.W. nor McMillon brought the matter to arbitration.

■ In construing and interpreting a management-labor collective bargaining agreement, it becomes necessary, frequently, to go beyond the four corners of the contract, itself, and examine the agreement history in order to ascertain the intent of the entire agreement and to determine, from the entire agreement, the rights and duties of the various parties. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) v. White Motor Corporation,* 505 F.2d 1193 (8th Cir.1974). The rules of contract law, governing ordinary agreements, do not necessarily apply here. It is not only proper, but frequently necessary, to consider the historical practices, usages and customs pertaining to collective bargaining agreements. *Transportation–Communication Employees Union v. Union Pacific Railroad Co.,* 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966).

We conclude that the coordination plan was an important and integral part of the entire collective bargaining agreement and was made a part of the detailed, written, collective bargaining agreement by reference as well as by long, historical, custom, usage and practice. We determine that the coordination plan was specifically and specially referred to in XV(e) of the labor contract. We further conclude that McMillon's complaints and cause of action, if any, before the State District Judge were covered by, and had to be resolved through, the grievance and arbitration procedures.

■ Recent editorial writers and historians have referred to certain national administrations as engaging in an imperial presidency. It is clear that the U.S. Congress has engaged in some imperialism of its own in that it mandated and has required a uniform national labor policy to effectively keep in force a uniform, national, management-labor relations policy. The Congress has preempted and forbidden State Courts from hearing cases involving compulsory grievance and arbitration procedures. Congress deems any State Court's jurisdiction would interfere with congressional labor policy. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

■ Regardless of whether McMillon's cause of action is described as a wrongful garnishment, or some other action, and whether the same sounds in contract or tort, if the determination of such pleaded claim is, in a substantial and meaningful way, dependent upon an analysis, interpretation and construction of the terms of the collective bargaining agreement, such claim is preempted by the federal labor law. Generally, state courts simply cannot determine the same. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). It is undisputed, under this record, that McMillon did not exhaust the grievance and arbitration procedures established in the collective bargaining agreement prior to bringing this case in the state court. Indeed, he did not commence or initiate a grievance proceeding nor an arbitration case.

It is interesting to note that neither the I.B.E.W., nor any of its officers, were a party to the state court proceeding. *Allis–Chalmers Corp., supra,* held that these sorts of claims come under Sec. 301 of the Labor Management Relations Act, 29 U.S. C.A. Sec. 185 (1978). Indeed, the court further concluded that, in the alternative, even if the alleged claim was deemed to arise under some state law; nevertheless, it was preempted by the federal labor law, the court writing, in 471 U.S. 202, at page 209, 105 S.Ct. 1904, at page 1910, 85 L.Ed.2d 206, at page 214.

"Section 301 of the LMRA states:

'Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties....' 29 USC Sec. 185(a) [29 USCS Sec. 185(a)]."

We conclude, with some reluctance, that this federal law is now well established. We are constrained to follow the same. Otherwise, it is said that, if the individual members of a collective bargaining unit fail to abide by the grievance and arbitration

procedures, the same procedures would lose their vitality and effectiveness. Such a practice would then diminish one of the paramount tenets or rationale for a uniform federal labor contract law that favors arbitrators and arbitration. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

■ We decide that "Randy" and wife, Tana, released this cause of action subjudice when he settled his lawsuit in federal court against Southwestern Bell because we determine that the Appellant did not, in a true sense, garnish a portion of Randy's wages. A complete and detailed settlement agreement and release, as is the one before us, is completely valid on its face and was given for a valuable, substantial consideration. It has not been set aside nor has any attempt been made to set the same aside. Therefore, it is a complete bar to a later action, or the various causes of action, that were released fully therein. *DeLuca v. Munzel*, 673 S.W.2d 373 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

The Supreme Court of Texas has defined garnishment and has held:

"Garnishment is a statutory proceeding whereby the property, money, or credits of one person in the possession of, or owing by another are applied to the payment of the debt of a debtor by means of proper statutory process issued against the debtor and the garnishee...."

"Such proceedings were not known to the common law, but are purely statutory. Also, such proceedings bring into court strangers to the main suit, and subject them to much inconvenience and hazard. It follows that such proceedings cannot be sustained unless they are in strict conformity with statutory requirements...."

*Beggs v. Fite*, 130 Tex. 46, 106 S.W.2d 1039 (1937).

■ Although the Appellee's pleadings complain of a wrongful garnishment, we simply find no evidence of garnishment.

We think the points of error above discussed are dispositive of this appeal. For the reasons stated above, we are constrained to reverse the judgment of the trial court and render the same that the Appellee, McMillon, take nothing against Gulf States Utilities Company. See the unanimous opinion of this court in *Crocker v. Synpol, Inc.*, 732 S.W.2d 429 (Tex.App. —Beaumont 1987, no writ).

The dissent concedes that, arguably, the trial court found that the coordination plan was a part of the bargaining agreement. That is an important and crucial concession and, under the federal labor law, brings into full play *San Diego Bldg. Trades Council v. Garmon, supra*, and all of its sequelae.

REVERSED AND RENDERED.

BURGESS, Justice, dissenting.

I respectfully dissent. The majority, without specifically mentioning appellant's points of error, overturns a bench trial. By doing so, the majority disregards those findings of fact and conclusions of law of the trial judge. Points of error one and two deal with grievance and arbitration. Points of error three through six deal with the alleged breach, coordination and garnishment issues. Points of error seven and eight raise the question of the release.

The trial court made the following findings and conclusions:

FINDINGS OF FACT

....

5. That at all times material hereto, there was in full force and effect a labor contract which was negotiated by the Independent Brotherhood of Electrical Workers with Gulf States Utilities Company.

....

15. That Gulf States Utilities Company breached the labor contract entered into between the Independent Brotherhood of Electrical Workers and Gulf States Utilities Company by failing to pay the Plaintiff the contractually specified rate of pay contained within the labor contract during the aforementioned pay periods

and by withholding money from the Plaintiff's paychecks as an offset for worker's compensation benefits the Plaintiff was receiving from Texas Employers Insurance Association.

. . . .

### CONCLUSIONS OF LAW

1. Any questions concerning the arbitrability of the Plaintiff's claim for wages withheld by Gulf States are properly before this Court pursuant to Article VII Sec. I of the applicable labor agreement.

2. The Plaintiff's claim for wages withheld by Gulf States is not an arbitrable subject. Article VII Sec. I of the applicable labor agreement specifically provides that "changes in salary and wage rates shown in 'Exhibit A' are not arbitrable." The Court further finds that by withholding money from the Plaintiff, Gulf States effectively changed his salary or wage rate.

. . . .

The majority deals with grievance and arbitration separately, but this is not necessary for my analysis. If the reduction of appellee's wages is a change in the salary and wage rate which is not arbitrable, then the issue of grievance is moot. Arbitration is nothing more than the final step in the grievance procedure. If arbitration is not applicable to a situation, neither is grievance. "Exhibit A" to the contract is the listing of salary and wage rates. Article XIV(1) requires the employer to pay the salary and wage rate shown in "Exhibit A." The contract language is clear and unambiguous wherein it states:

1. The following subjects shall not be subject to arbitration, and no arbitrator who may be chosen to serve in any arbitration proceeding shall have power to make an award which *touches upon* such subject.

Subcontracting or contracting out work, changes in salary and wage rates shown in "Exhibit A",.... (emphasis added)

The phrase "touches upon" is broad indeed. It is certainly not a qualifier in any sense of the word. There is clearly no language which limits the arbitration exclusion to a total change rather than a single change. The trial court's interpretation of the contract is not one which is totally devoid of logic. Therefore, I would not overturn the judgment on the basis of failure to follow the grievance or arbitration procedures.

Next is the issue of withholding wages from appellee. The majority holds that the coordination plan has been recognized under the contract through Article XV(e). That provision merely states that employee benefits shall not be reduced because of workers' compensation benefits being coordinated with his salary. The trial court explicitly found that the workers' compensation benefits received by appellee were for loss of the use of his leg and not for lost wages or loss of wage-earning capacity. The court then found that appellant had no contractual right to withhold the wage. Arguably, the trial court found that the coordination plan was a part of the bargaining agreement, but that such coordination plan only covered those workers' compensation benefits which were received for lost wages or loss of wage-earning capacity since the benefits plans previously mentioned were tied to wages and the contract intent was to keep the wage level the same for benefit purposes. The majority simply does not address this aspect of the trial judge's findings.

The trial judge did not make any findings on the release question. A release must be considered as a whole in order to give effect to its general purpose and true intention of the parties. *Loy v. Kuykendall*, 347 S.W.2d 726, 728 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.). When reading the entire release it is clear that appellee intended to execute the release for any damages arising out of his personal injury, but reserved the cause of action arising out of the alleged breach of contract of employment in connection with the withholding of his wages. I do concede that appellee used the phrase "for unlawfully garnishing a portion of ... wages" in conjunction with the phrase for "breach of contract." This, however, should be read

as the generic "garnishment,"; *i.e.*, a wrongful withholding of wages. In any event, the trial judge did not accept the defense of release, and I am unwilling to say he erred. I would affirm the judgment of the trial court.[1] Since the majority fails to do so, I respectfully dissent.

---

1. I would also uphold the trial court's denial of attorney's fees raised by appellee in a cross-point. The trial court found that appellee had failed to make proper presentment of his claim.