## NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 16a0336n.06

Case No. 15-1625

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Jun 20, 2016

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ISAREL FLATFORD, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| INTERNATIONAL UNION UNITED | ) | MICHIGAN |
| AUTOMOBILE, AEROSPACE AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | **OPINION** |
| WORKERS OF AMERICA, LOCAL 663, et | ) | |
| al., | ) | |
| | | |
| Defendants-Appellees. | | |

BEFORE: SILER, COOK, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** A group of union employees brought a federal civil suit alleging both a hybrid Section 301/fair representation claim as well as an Indiana common law fraud claim. The union employees claim that their union, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 663, and their present employer, General Motors, LLC, violated promises that were initially made at a meeting and later reduced to writing in a memorandum of understanding. The district court held that (1) Section 301 completely preempted their state law fraud claim, therefore it was subsumed in their Section 301/fair representation claim and that (2) their Section 301/fair

representation claim was not timely filed. The district court granted summary judgment for the

Defendants. The employees timely appealed.

For the reasons detailed below, we **AFFIRM**.

I.

Plaintiffs are former employees of Guide Corporation ("Guide"), a supplier of auto parts

to Defendant General Motors, LLC ("General Motors"). Plaintiffs worked at Guide's factory in

Anderson, Indiana. On or about January 12, 2007, Guide closed the Anderson factory. Shortly

after the closing, Plaintiffs' union, International Union United Automobile, Aerospace and

Agricultural Implement Workers of America ("UAW") and its local chapter, UAW 663

(collectively referred to as the "Union") in conjunction with General Motors sponsored an

informational meeting for Guide employees, where the parties discussed how Guide's employees

would be treated after the factory closure. Plaintiffs allege during that meeting UAW and

General Motors promised that the displaced Guide employees would receive certain hiring

preferences at General Motors and certain wage guarantees if General Motors ever employed

them. Based on those representations, the Guide employees voted to approve a memorandum of

understanding ("MOU").

Plaintiffs, Guide, and General Motors ultimately completed and executed the MOU. The

MOU established the "Special Attrition Program," which provided Union workers with seven

separate severance and/or employment options. The options would grant them certain rights and

govern certain aspects of their relationship with General Motors. Plaintiffs chose to participate

in Option 5, which reads in pertinent part:

> For those Guide employees without seniority rights to General Motors, remain on
> the seniority rolls for Guide Corporation and be governed by the current
> agreements between Guide Corporation and the UAW, make application for
> General Motors new hire consideration consistent with the process and

administrative rules developed by the parties including relocation allowance, if applicable, in the amount of $12,500. Upon being hired by General Motors, the employee will lose all seniority rights at Guide and will sever all ties with Guide except for treatment under the Guide Hourly-Rate Employees' Pension Plan ("Guide HRP") that will be described subsequently by the parties. These employees will not be eligible for any payments contemplated elsewhere within this Option or any other Option of this Special Attrition Program.

(Page ID # 169–71.)

Subsequently, Dean Munger, Executive Director of Labor Relations for General Motors, sent a letter to the Union clarifying, among other things, that Guide employees hired by General Motors will receive a wage rate based on their current projection at Guide. For purposes of this appeal, all parties agree that the MOU and Dean Munger's letter created a "hiring preference" for Plaintiffs and guaranteed them a certain wage ("wage guarantee") if they were ultimately hired by General Motors.

In late 2007 and/or early 2008, Plaintiffs came to believe that General Motors breached the MOU. Therefore, Plaintiffs filed two grievances[1] with the Union, specifically regarding the "hiring preference" breach. Plaintiffs alleged that General Motors "failed to offer job opportunities to UAW Guide Option 5 Participants from the Anderson and Monroe Plants while hiring [other] permanent employees." (Page ID # 221.)

UAW's Associate General Counsel reviewed the Plaintiffs' hiring grievances and determined that they lacked merit because, in his opinion, there was no evidence that General Motors breached the MOU. Therefore, the Union withdrew the grievances and opted not to pursue them on the Plaintiffs' behalf. Plaintiffs appealed the Union's decision to the UAW

---

[1] The first grievance (11810) was dated October 4, 2007, and the date on the other grievance (11851) is illegible.

- 3 -

International Executive Board ("IEB"). On May 20, 2010, the Union notified Plaintiffs that the IEB denied their appeal.[2]

In early 2012, five of the Plaintiffs who had been hired by General Motors following the closure of the Anderson factory came to believe that General Motors breached the wage guarantee. In January 2012, those five Plaintiffs filed a grievance ("wage grievance") with the Union. On October 25, 2012, UAW's President Bob King ("President King"), in a letter, denied the wage grievance on the ground that it had been superseded by a subsequent agreement between UAW and General Motors. The letter concluded by stating, "[p]ursuant to Article 33, Section 2B of the International Constitution, your appeal is respectfully denied and this matter is closed." (Page ID # 252.)

On November 30, 2012, plaintiff Isarel Flatford ("Flatford") alleges that he wrote a letter to President King requesting an appeal.[3] The letter asked President King to forward the appeal letter to the public review board ("PRB"). After receiving no response, on February 7, 2013, Flatford sent another letter asking that President King forward Plaintiffs' appeal letter to the PRB. On the same day, Flatford sent a letter, on behalf of the Plaintiffs, to Barbra Klein ("Klein"), the Executive Director of the PRB, informing her about their appeal and asking her to "take the time to look through this matter." (Page ID # 259.) Flatford also forwarded Klein the appeal information/documents that he had been previously sent to President King.

On February 28, 2013, Klein responded to Flatford. In her letter, she stated that "there is generally no appeal from a ruling of the International President issued pursuant to Article 33

---

[2] Plaintiffs take no issue on appeal with the way this grievance was handled.

[3] On April 4, 2013, Eunice Stokes-Wilson, administrative assistant to President King, sent Flatford a letter that stated that President King had never received the November 30, 2012 letter. The letter also stated that "[t]he February 28, 2013 letter from the PRB captures the position we must constitutionally embrace. As a result we are closing this file." (Page ID # 265.) However, for purposes of this appeal, we assume the letter was sent and received. *See* Fed. R. Civ. P. 56.

§2(b)." (Page ID # 267.) Klein's letter also advised, "[i]f Article 33, §2(b) applies to your appeal, President King's decision is final and no further proceedings are authorized by the Constitution." (Page ID # 267.)

On October 4, 2013, Plaintiffs filed their hybrid Section 301/fair representation suit. At the scheduling conference, the district court ordered, and the parties agreed, to conduct the litigation in phases. During the first phase, each party would conduct discovery solely concerning whether Plaintiffs filed their suit within the applicable statute of limitations. At the conclusion of the first phase, the district court granted Defendants' motions for summary judgment, holding that Plaintiffs had not timely filed suit and that their state law claims were completely preempted by Section 301. Plaintiffs timely appealed.

## II.

We review a district court's summary judgment decision *de novo*. *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). "Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 462 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the non-moving party." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 591-92 (6th Cir. 2001). "To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact." *Id.*

## III.

On appeal, Plaintiffs' brief sets forth two issues for review. First, they allege that the district court erred in granting summary judgment with respect to their wage grievance claim

because they filed this suit within the applicable statute of limitations. Second, they argue that the district court erred in holding that their state law fraud claims were preempted by federal law. We address each in turn.

A.

Plaintiffs' federal cause of action against General Motors and the Union is commonly referred to as a "hybrid § 301/fair representation" claim. *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 165 (1983). "In a hybrid suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to recover against the Company or the Union, [Plaintiffs] must show that the Company breached the Agreement and that the Union breached its duty of fair representation." *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559–60 (6th Cir. 1990).

"[H]ybrid section 301/unfair representation claims are subject to the six-month statute of limitations." *Adkins v. Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO-CLC*, 769 F.2d 330, 334 (6th Cir. 1985). A claim starts to accrue "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Id.* at 335 (citation omitted). However, while union members are engaged in a good faith attempt to exhaust their internal remedies, the six-month statute of limitations is tolled. *Dunleavy v. Local 1617, United Steelworkers of Am.*, 814 F.2d 1087, 1091 (6th Cir. 1987); *see also Howell v. Gen. Motors Corp.*, 19 F. App'x 163, 167 (6th Cir. 2001) (discussing the policy underlying equitable tolling for union members who choose to exhaust their administrative remedies prior to filing suit). Although a plaintiff's case may be tolled while he is pursuing an internal remedy process, the statute begins to run when a plaintiff "reasonabl[y] should know that the union has abandoned" his claim. *Wilson v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 83 F.3d 747, 757 (6th Cir. 1996) (citation omitted);

*see also Garrish v. Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am.*, 417 F.3d 590, 594 (6th Cir. 2005) ("The determination of the accrual date is an objective one: the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue.") (quoting *Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1000 (6th Cir.1994).

Plaintiffs argue that their suit was filed within the applicable six-month statute of limitations because President King's October 25, 2012 letter along with subsequent correspondence from the PRB led them to believe that the matter was still pending. Plaintiffs further contend that the six-month statute of limitations was tolled until August 4, 2013—the date Plaintiffs received a letter from President King's administrative assistant, Eunice Stokes-Wilson, which they allege was the only correspondence that removed any doubt that the matter was closed. If that were the case, the filing of their suit on October 4, 2013, was well within the six-month statute of limitations.

We disagree with the Plaintiffs' characterization of the correspondence they received prior to Eunice Stokes-Wilson's letter, and hold that the statute of limitations started to run on October 25, 2012, the day President King sent his initial letter to the Plaintiffs. As the district court aptly pointed out, nothing about President King's letter was equivocal or could be interpreted to lead a reasonable individual to believe that the matter was still pending. To the contrary, the purpose of President King's letter was clear and definite, as it concluded by stating, "[p]ursuant to Article 33, Section 2B of the Institutional Constitution, *your appeal is respectfully denied and this matter is closed.*"  (Page ID # 252) (emphasis added).[4]

---

[4]  Article 33, Section 2(b) of the Institutional Constitution provides as follows:

Attempting to undermine the finality of President King's letter, Plaintiffs make two unpersuasive arguments. First, as mentioned above, they point to correspondence from the PRB sent after President King's letter to show that confusion existed as to whether their appeal was still pending. However, the PRB's correspondence affirmed President King's position. Moreover, this court has previously held that "perseverance despite the lack of available relief" does not re-toll the statute of limitations. *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 804 (6th Cir. 1990) (concluding that once a plaintiff is told in no uncertain terms that every possible avenue for relief had been exhausted, the fact that she continued to pursue her appeal after receiving such notice was a nullity and did not alter her accrual date). Therefore, any attempt the Plaintiffs made after President King's letter to pursue a possible internal appeal amounts to a nullity.

Lastly, as it relates to Plaintiffs' first argument, even if, as Plaintiffs contend, President King's letter left some ambiguity as to the status of their appeal, Klein's February 28, 2013 letter removed all doubt. Therefore, even if the date of Klein's letter triggered the running of the statute of limitations, since Plaintiffs' complaint was not filed until October 4, 2013 (more than six months after they received Klein's letter) they are still foreclosed from litigating their claim.

Second, it appears that Plaintiffs argue that they were not sophisticated and therefore should not be held responsible for "misinterpret[ing] UAW's Constitution." (Appellant Br. 14–19). That assertion is of no consequence because members of a union are responsible for knowing the collective bargaining agreement. *See Shapiro v. Cook United, Inc.*, 762 F.2d 49, 51

---

For an interpretation of a collective bargaining agreement by a National Department or Regional Director, where the interpretation is so obviously correct that no purpose will be served by an appeal, and where it is consistent with other provisions of this Constitution and International Union policy, the appeal shall be directly [sic] to the International President. There shall be no further appeal from that decision.

(Page ID # 404.)

(6th Cir. 1985). Relatedly, Plaintiffs also argue that President King and Klein misinterpreted UAW's Constitution and that President King's decision was reviewable. Plaintiffs' argument amounts to a nullity. Whether or not President King disposed of the appeal properly under UAW's Constitution is beside the point. What is relevant is that President King had the authority under the cited provision in his letter to dispose of the appeal and that he communicated his decision that the Union would be not be pursuing the appeal in unequivocal terms. Accordingly, we affirm the district court's decision.

B.

Section 301 of the Labor Management Relations Act provides as follows:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

The Supreme Court has held that Section 301 "preempts state law rules that substantially implicate the meaning of collective bargaining agreement terms." *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985)).

This court applies a two-step approach for determining whether Section 301 preemption applies. First, this court "must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms." *DeCoe*, 32 F.3d at 216 (citation omitted). Second, "the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law." *Id.* "If the right both is borne of state

law and does not invoke contract interpretation, then there is no preemption." *Id.* "However, if neither or only one criterion is satisfied, section 301 preemption is warranted." *Id.*

Plaintiffs and UAW each dedicate a good portion of their respective brief(s) attempting to analogize this case to cases they believe support their respective position. Therefore, a brief discussion of the case principally relied upon by each party is warranted to firmly grasp the argument they set forth on appeal.

Plaintiffs cite to the Supreme Court's decision in *Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987), to support their contention that their state law claims are not preempted by Section 301.[5] In *Caterpillar*, the plaintiffs alleged that, "Caterpillar made oral and written representations that they could look forward to indefinite and lasting employment with the corporation and that they could count on the corporation to take care of them." *Id.* at 388. That promise, the plaintiffs argued, created "a total employment agreement wholly independent of the collective-bargaining agreement." *Id.* at 389. Once plaintiffs believed Caterpillar breached their "employment agreement," they filed suit in California state court solely based on California law. *Id.* at 390. Caterpillar removed the case to federal court, asserting that the claim was completely preempted by federal law. *Id.* The district court concluded that removal was proper; however, the Ninth Circuit reversed, holding that the case was improperly removed. *Id.* at 390–91.

The Supreme Court agreed with the Ninth Circuit and held that the plaintiffs' case was not preempted. In reaching that conclusion, the Court reasoned that, "Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Id.* at 395 (quoting

---

[5] Plaintiffs also rely on this court's decisions in *Alongi v. Ford Motor Co.*, 386 F.3d 716 (6th Cir. 2004) and *Sanford St. Local Dev. Corp. v. Textron, Inc.*, 768 F. Supp. 1218, 1220 (W.D. Mich.) *vacated*, 805 F. Supp. 29 (W.D. Mich. 1991). However, an explanation of these cases is not necessary because *Caterpillar* adequately encapsulates Plaintiffs' preemption argument.

*Elec. Workers v. Hechler*, 481 U.S. 851, 859 (1987)). The Court determined that since the plaintiffs' state law claims were based on an employment agreement separate and completely unassociated from the collective bargaining agreement, it fell outside the purview of Section 301. *Id.* at 394–95 ("[The] complaint is not substantially dependent upon interpretation of the collective-bargaining agreement. It does not rely upon the collective agreement indirectly, nor does it address the relationship between the individual contracts and the collective agreement.").

In contrast, UAW and the district court rely on *Adkins v. General Motors Corp.*, 946 F.2d 1201 (6th Cir. 1991). In *Adkins*, the plaintiffs brought a "hybrid unfair representation" suit against the defendants, but they also pursued pendent state law claims for breach of contract, tortious interference with contract rights, intentional infliction of emotional distress, and loss of consortium. *Adkin*s, 946 F.2d at 1202. When the plaintiffs' federal law claim was dismissed as untimely, all their state law claims were also dismissed without prejudice for "lack of a substantial federal question to support the exercise of jurisdiction." *Id.* Undeterred, the plaintiffs filed suit in state court asserting their state law claims with the addition of fraud. *Id.* The defendants removed the case to federal court, asserting that the claims were completely preempted by federal law. *Id.* at 1202–03. Ultimately, the district court held that the fraud and tortious interference claims were preempted and thus barred by the six-month statute of limitations, but that some of the plaintiffs' emotional distress claims were not. *Id.* at 1203.

This court affirmed the district court's holding with respect to the fraud and tortious interference claims but vacated the district court's holding that some of the plaintiffs' emotional distress were not preempted and held that all the plaintiffs' state law claims were preempted.[6] *Id.* With regard to the fraud claim, this court first recited the elements of fraud under Ohio law:

---

[6] For purposes of this opinion, a summary detailing why this court dismissed the plaintiffs' tortious interference claims and did not dismiss some of their emotional distress claims is unnecessary.

(1) a misrepresentation or concealment of fact material to the transaction, (2) that the party against whom fraud is alleged knew of the falsity of his misrepresentation or was so indifferent to truth or falsity that knowledge may be inferred, and (3) that the misrepresentations were made with the intent of inducing the other party to rely on it to his detriment. *Id.* at 1209. Based on those elements this court reasoned,

> In order to make . . . a [fraud] determination in this case, the court would have to ascertain what the plaintiffs' rights were under the bridge agreement; whether they had been abrogated under the 1979 collective-bargaining agreement; what the Local's president had told plaintiffs about the 1979 collective-bargaining agreement; whether or not it was false, given the court's construction of the agreements at issue; and whether the Local president knew or should have known of its falsity. These determinations require an analysis of both the "bridge agreement" and the 1979 collective-bargaining agreement.

*Id.*

Thus, since plaintiffs' fraud claims could not be adjudicated without determining what rights they had (or did not have) under the collective bargaining agreement, this court found that their fraud claims were completely preempted. *Id.*

Turning to the present case, in Indiana, to state a valid fraud claim in Indiana, a plaintiff must prove (1) a material misrepresentation, (2) of past of existing facts, (3) the falsity of the representation, (4) that the representation was made with knowledge or reckless ignorance of its falsity, and (5) detrimental reliance on the representations. *AutoXchange.com, Inc. v. Dreyer & Reinbold, Inc.*, 816 N.E.2d 40, 51 (Ind. Ct. App. 2004). In bringing their fraud claims, Plaintiffs' complaint relies on the following allegations: (1) UAW made verbal promises, which were later reduced to writing in the MOU about certain rights (specifically flow back rights) plaintiffs would have with General Motors; and (2) UAW and General Motors breached the MOU. (Page ID # 5–6).

Thus, it is apparent that this case is analogous to *Adkins* because not only would the MOU have to be consulted to resolve Plaintiffs' fraud claims, but the promises that they allege Defendants breached are contained within the MOU. Unlike in *Caterpillar*, where the plaintiffs' state law claim was premised on a violation of a separate employment agreement, in this case, Plaintiffs' claims are based on violations of the MOU. In fact, Plaintiffs' allegations are more suited for a breach of contract claim as opposed to a fraud claim. Consequently, Plaintiffs' fraud allegations do not survive the first step of this court's two-step analysis in evaluating whether a claim is preempted by Section 301 because their claims require "interpretation of collective bargaining agreement terms." *DeCoe*, 32 F.3d at 216. Likewise, the second prong is also not satisfied because the flow back right claimed by Plaintiffs is solely a product of the MOU. *Id.*; *see also Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033, 1037 (6th Cir. 1989) (stating that Section 301 preempts claims based directly on rights created by collectively bargained agreements).

In attempting to analogize the facts of this case to *Caterpillar*, Plaintiffs' brief ignores the allegations made in their compliant. Specifically, they contend that analyzing their claim "does not require interpretation of any . . . agreement." (Appellant Br. 42.) However, Plaintiffs' complaint, which they were the master of, *see Roddy v. Grand Trunk Western Railroad Inc.*, 395 F.3d 318, 322 (6th Cir. 2005), alleges a fraud claim based of broken promises contained within the MOU. Moreover, to make the distinction more apparent, unlike the plaintiffs in *Caterpillar*, whose fraud claim was based on a separate employment agreement, in this case Plaintiffs do not allege that they ever entered into a separate employment agreement. *See Caterpillar Inc.*, 432 U.S. at 388. In the end, nothing about *Caterpillar*'s analysis is applicable to this case because the facts are materially different. Accordingly, we affirm the district court's decision.

III.

For the reasons detailed above, we **AFFIRM** the district court.